131

1    that Melissa Le provided you a draft user manual;

2    do you see that?

3         A.    I do see it.

4         Q.    Can you explain what a draft user

5    manual is?

6         A.    It was an operational guide for people

7    using the system to know how to maneuver their way

8    through, just like if you received an example of

9    how to use Microsoft Word.

10        Q.    Okay.  And who created the draft user

11   manual?

12        A.    Melissa Le did.

13        Q.    She actually created this manual for

14   you to use?

15        A.    No.  She created a skeleton of it or an

16   outline.  She started it, and different people on

17   the support team finished it or worked on it at

18   various times.

19        Q.    Did you ever at any point in time while

20   at MediaBank make any modifications to the manual?

21        A.    The digital user manual, yes.

22        Q.    Okay.  Do you remember the times when

23   you made those changes?

24        A.    No, I do not.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

132

1      Q.    Do you remember what changes you made?

2      A.    No, I do not.

3      Q.    Do you remember how many times you made

4    changes?

5      A.    No, I do not.

6      Q.    More than once?

7      A.    I don't remember.

8      Q.    Now, the first sentence also indicates

9    that you were asked to follow the format, operate

10   the system and suggest modifications from user

11   perspective.  Do you see that?  It's the first

12   sentence of that paragraph.

13     A.    Okay.

14     Q.    Do you see that?

15     A.    I do see that.

16     Q.    What does that mean, "suggest

17   modifications from user perspective"?

18     A.    Changes to the manual, changes to the

19   manual based on a user perspective as opposed to a

20   technical perspective.

21     Q.    Okay.  So you understood that what you

22   were going to be making changes to, if at all, was

23   changes that the user needed, not from a technical

24   perspective?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

133

1      A.      That's correct.

2      Q.      And you said you did in fact make some

3   changes, you just don't remember when or how many?

4      MR. WASSERMAN:  I object.  That

5   mischaracterizes her testimony.

6             You can answer the question.

7   BY THE WITNESS:

8      A.      I want you to restate the question.  I

9   don't understand if you are asking me about the

10  manual or asking me about the changes to the

11  manual or changes to the system.

12  BY MR. LEFKOFSKY:

13     Q.      Changes to the manual.

14     A.      I did make changes to the manual, yes.

15     Q.      Based on -- from a user perspective?

16  You just said from a user perspective, not a

17  technical perspective.

18     A.      That's right.  As a user of the system,

19  I made changes to the manual so that it was

20  understandable for a person who was using it.

21     Q.      And were those changes implemented and

22  became part of the manual?

23     A.      I don't know.  I don't remember.

24     Q.      Now, it also says that you participated



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

134

1    in several user acceptance tests.  What were

2    those?

3           A.     That was us walking the client through

4    new system functionality, additions to the

5    software.  So now you can use bold as opposed to

6    only italic font.  That's a simplistic version,

7    but that's what it is.

8           Q.     And some of these changes were more

9    complex than the type of font you were using,

10   right?

11          A.     I imagine so, yes.

12          Q.     Do you remember?

13          A.     I don't remember, no.  I don't

14   recollect a specific example.

15          Q.     You said "us."  You referred to sort of

16   more than one.  Who would be people that would be

17   doing what you did, which was participate in user

18   acceptance tests?

19          A.     Gina Grandinetti, Renee Simpson,

20   Melissa Le.

21          Q.     Now, is this something you did together

22   with this group or you did it separately but

23   everybody in the group at some point in time did

24   it?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

135

1       A.    No, it was a collective team thing.

2       Q.    It also indicates here that you were

3    assisting MediaBank clients in using the O|X

4    system to ensure its functionality, right?  That's

5    the language in here?

6       A.    Yes.

7       Q.    What did you mean by "ensure its

8    functionality"?

9       A.    Make sure that it was working, that

10   when the users were entering information their

11   data actually went somewhere.

12      Q.    Okay.  Based on what MediaBank did, do

13   you think that was an important job that you were

14   doing at MediaBank?

15      A.    Do I think what job was important?

16      Q.    Assisting MediaBank's clients in using

17   the O|X system to ensure its functionality.

18      A.    Yes.

19      Q.    Okay.  Do you think it was important

20   that you were involved in making modifications

21   from a user perspective to the user manual?  Was

22   that important for MediaBank's business?

23      A.    Important to me or important to

24   MediaBank?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

136

1      Q.    Both.  Was it important to you?

2      A.    Sure, yes.

3      Q.    Okay.  Why was it important to you?

4      A.    It was my job.

5      Q.    Okay.  And do you think it was

6   important to MediaBank?

7      A.    Yes.

8      Q.    Why do you think it was important to

9   MediaBank?

10      A.    Because it was their reputation.

11      Q.    It goes on to say, Ms. Verkuilen, that

12   you did not test the system to determine what

13   hardware, software or system functional

14   specifications were required because you did not

15   possess the requisite knowledge or skill necessary

16   to do so.  Do you see that?

17      A.    No, I do not.  What paragraph?

18      Q.    It's the sentence right after the

19   one -- it's the last full sentence on page 3 of

20   that document.

21      A.    Oh, page 3.  That's correct.

22      Q.    The statement is correct?

23      A.    Yes, it is.

24      Q.    Okay.  Did you test the system for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

137

1    anything else other than determining hardware,

2    software or system functional specifications?

3    Because it specifically says you didn't test the

4    system to determine those three things, so what

5    I'm wondering is:  Did you test the system to

6    determine anything else?

7         Q.    Anything else such as?

8         Q.    I don't know.  You would know if you

9    did it.  I'm asking --

10        A.    I played with the system.

11        Q.    What does that mean?

12        A.    It means I entered in data, I checked

13   the results.

14        Q.    Okay.  Is that -- would you consider

15   that testing the system?

16        A.    I don't know.

17        Q.    Well, you testified previously -- and

18   if I mischaracterize your testimony, please stop

19   me -- that if there was a client problem that came

20   in, a JIRA ticket, and it was fixed by QA or

21   development, you would test that to make sure it

22   worked before giving it to the client, right?

23        A.    Yes.

24        Q.    You would test the fix?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8847
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                          FEBRUARY 25, 2010

138

1      MR. WASSERMAN:  I object to the extent that

2   you are trying to characterize her testimony in

3   any way.  If you want to ask her a question,

4   she'll be happy to answer it.

5      MR. LEFKOFSKY:  No problem.

6   BY MR. LEFKOFSKY:

7      Q.    So that's true, right?

8      A.    So I was trying to reproduce the same

9   issue the client was having on my own.  If we want

10  to call that testing, then yes, that was testing.

11  All I was trying to do was reproduce the issue.

12     Q.    Yeah.  I don't want to call it

13  anything.  I want to know what you call it.

14           Would you call that testing the system

15  in some way?

16     A.    I don't know what I would call it.  I

17  would say definitely "reproducing the issue" would

18  be more appropriate.

19     Q.    Would you call that testing the

20  solution?

21     A.    It depends on the situation.

22     Q.    Could it be considered testing the

23  solution in some situations?

24     A.    Do you have an example of that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

139

1    situation?

2        Q.    You did the work, so were there any

3    situations that you can recall that you would

4    classify as testing the solution before you sent

5    it to the client?

6        A.    No.  I would still call it

7    "reproducing."

8        Q.    "Reproducing the problem," right?

9        A.    Right.

10       Q.    And then seeing if the solution solved

11   the problem?

12       A.    Correct.

13       Q.    Okay.  Take a look at the next thing

14   you indicate, that you assisted MediaBank's

15   clients with onsite training and functionality

16   sessions to determine whether the system met the

17   customer's requirements; do you see that?

18       A.    Yes, I do.

19       Q.    Okay.  And you had testified previously

20   about some of these training classes, right?

21       A.    Yes.

22       Q.    Is that what you are including in that

23   statement?

24       A.    Onsite training would be that training.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

140

1      Q.      And helping specific users while you

2  were onsite?

3      A.      Could be involved in that onsite

4  training, yes.

5      Q.      What would a functionality session be?

6      A.      A session where we are getting

7  information from the client to share with

8  MediaBank on changes that the customer is

9  requesting.

10     MR. LEFKOFSKY:  Can you just read that last

11 part back.

12              (WHEREUPON, the record was

13              read by the reporter.)

14 BY MR. LEFKOFSKY:

15     Q.      Who would you share those with at

16 MediaBank?

17     A.      Internal team members on QA,

18 development, potentially my manager.  It depended

19 on the situation.

20     Q.      Okay.

21     A.      Sometimes the system worked as it was

22 created.  Sometimes the client wanted changes.

23     Q.      Okay.  These things that you are

24 describing in this sentence that we just talked



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

141

1    about, would you consider that an important part

2    of MediaBank's business?

3         A.    I don't know.

4         Q.    I'm asking what you would consider.

5    I'm not asking you what MediaBank thinks.

6         Do you consider -- based on you working

7    at MediaBank and knowing what MediaBank does, do

8    you consider what you are explaining in this

9    sentence to be important to MediaBank's business?

10        A.    Yes.

11        Q.    Okay.  Was somebody overseeing

12   everything you did during this period of time?

13        A.    I don't remember.

14        Q.    Did you ever make decisions on your own

15   during this period of time?

16        A.    I don't remember.

17        Q.    Now, it indicates here in the last

18   sentence that you say you worked approximately

19   60 hours a week, and this is from October 1, 2007,

20   to December 31, 2007, right?

21        A.    That is what it says, yes.

22        Q.    Okay.  And that's what -- this is

23   actually what you say, right?

24        A.    That's right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

142

1      Q.      Okay.  How do you know that?

2      A.      Because I know approximately when I

3  came into the office, I know approximately what

4  time I left, and I know that I was working on the

5  weekends.

6      Q.      Okay.  What time do you remember coming

7  into the office on average during these three

8  months?

9      A.      It varied.

10     Q.      Varied from when to when?

11     A.      Varied from 7:00 a.m. until 9:00 a.m.,

12  9:15 a.m.

13     Q.      Okay.  Would you say during this period

14  of three months that you were in the office closer

15  to 7:00 a.m. every morning or closer to 9:00 a.m.?

16     A.      I don't remember.

17     Q.      What time do you think you left the

18  office during these three months?

19     A.      I don't remember.

20     Q.      Then how is it that you remember

21  working 60 hours a week during the three months?

22     A.      Because I remember working 12-hour days

23  and on the weekends.

24     Q.      Every day during the three months?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

143

1     A.    Yes, just about.

2     Q.    But you don't remember when you came

3  in, right?

4     A.    No, I don't currently.

5     Q.    You don't remember when you left?

6     A.    I don't.

7     Q.    But you remember working 12-hour days?

8     A.    I do.

9     Q.    Do you have any record of that

10  anywhere?

11     A.    No, but I would imagine it would be in

12  my e-mail.

13     Q.    It would be in your e-mail the hours

14  that you worked?

15     A.    Well, communication from, during.

16     Q.    So if you were working 12 hours a day,

17  are you telling me that your e-mails would reflect

18  that based on the times of your e-mails?

19     A.    I don't know.

20     Q.    Okay.  I'm trying to sort of get some

21  clarification here because you have a statement

22  that goes back to October 1, 2007, to December 31,

23  2007, as part of this case saying that you worked

24  60 hours a week.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

144

1        A.      Correct.

2        Q.      And I'm trying to figure out how it is

3    that you are making that statement without -- you

4    don't have any documents to support that, right?

5    Because I've seen all the documents you've

6    produced in this case, correct?

7        A.      Yes.

8        Q.      Yes, you don't have any, right?

9        A.      I do not have any documents.

10       Q.      And you don't have any time records

11   that you kept while you were working?

12       A.      No, I don't.

13       Q.      You don't have any diaries or calendars

14   that you kept that would reflect the hours you

15   worked, correct?

16       A.      No.

17       Q.      So you don't remember when you came

18   into the office and you don't remember when you

19   left the office, right?

20       MR. WASSERMAN:   Object to the form and it's

21   already been asked and answered.

22   BY MR. LEFKOFSKY:

23       Q.      Correct?

24       MR. WASSERMAN:   You can answer the question.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

                                145

1    BY THE WITNESS:

2          A.    I know I worked 12 hours a day for

3    those three months, at least 60 hours a week in

4    the office, outside of the office, at the client's

5    site, on the weekends.

6    BY MR. LEFKOFSKY:

7          Q.    Well, you weren't at the client's site

8    until January 2008, right?

9          A.    I'm sorry?

10         Q.    You weren't at the client's site until

11   January 2008.

12         A.    That's right, but we were still doing

13   training sessions at the client even during that

14   period of time.

15         Q.    Okay.  Which clients?

16         A.    StarCom in particular.

17         Q.    What are the hours of StarCom's

18   business; do you know?

19         A.    I do not know.

20         Q.    Do you know if they are open earlier

21   than 8:00 a.m.?

22         A.    They were opening at 8:00 a.m. at that

23   point in time to conduct our training sessions.

24         Q.    Do you know if they close later than



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

146

1    6:00 p.m.?

2        A.    I do not know.  I know that I was in

3    their office beyond 6:00 p.m.

4        Q.    With whom?

5        A.    With another MediaBank employee and

6    several temps that were on the floor that we were

7    on.

8        Q.    So who is it that you worked with that

9    you believe can lend support to your statement

10   that you worked 60 hours a week during those three

11   months?

12       A.    I believe Elizabeth Williamson could

13   for part of the time, I believe Gina Grandinetti

14   could, I believe Ali McHone could.  I believe

15   three people who are temps that are listed in some

16   of the documentation that you provided could.

17       Q.    And have you talked to any of these

18   people about this statement that you worked

19   60 hours a week?

20       A.    No, I have not.

21       Q.    You didn't talk to them before you

22   filed suit in this case?

23       A.    I did not.

24       Q.    After you filed suit?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

147

1      A.      I have not.

2      Q.      Have you talked to anybody that

3   confirmed what you are saying here that you worked

4   60 hours a week during these three months?

5      A.      I don't know.

6      Q.      You don't know?

7      A.      I don't remember, no.

8      Q.      Can you read the next paragraph for me.

9      MR. WASSERMAN:  Can we take a two-minute

10  before we go to the next period?

11     MR. LEFKOFSKY:  Yes.

12              (WHEREUPON, a recess was had.)

13  BY MR. LEFKOFSKY:

14     Q.      I was just asking you if you could read

15  the next paragraph beginning with "During the

16  period."  Do you see that?

17     A.      January 1, 2008?

18     Q.      Yes.  Just let me know when you're

19  done.

20     A.      Okay.

21     Q.      Is this -- as you read it -- I know you

22  prepared this a little while ago.  Do you think

23  this is still entirely accurate?  Is there

24  anything you would change in this?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

148

1      A.     No, I don't think so.

2      Q.     Okay.  It's still accurate?

3      A.     I believe so, yes.

4      Q.     Okay.  You mentioned that StarCom had

5  offices in Chicago and Los Angeles.  It indicates

6  in here that you also provided onsite training in

7  Atlanta.  Who was that to?

8      A.     Moxie Interactive and also Turner.

9      Q.     So two clients in Atlanta, two

10 customers?

11     A.     Yes.

12     Q.     How often did you go -- do you remember

13 how often you went to Atlanta?

14     A.     I don't remember.

15     Q.     Do you remember how often you went to

16 Los Angeles?

17     A.     I don't remember.

18     Q.     Other than Atlanta and Los Angeles,

19 there's nothing else in here.  Were there any

20 other locations that you would provide onsite

21 training at?

22     A.     I traveled to Boston once and to

23 New York once.

24     Q.     For which clients; do you remember?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                          FEBRUARY 25, 2010

149

1      A.      MediaVest in New York, and I don't

2    remember the client in Boston.

3      Q.      And the description here that you've

4    indicated in this paragraph of what you did

5    onsite, would that apply to all the different

6    locations sort of equally or did you do something

7    different in Atlanta for the customers than you

8    did in Los Angeles?

9      A.      I don't remember.

10     Q.      Okay.  There's been a lot of discussion

11   of the JIRA tickets, and you mention it in this

12   paragraph.

13     A.      Uh-huh.

14     Q.      Explain to me, if you can, briefly:

15   What are JIRA tickets?

16     A.      A log that either an internal person at

17   Media creates or an external person files because

18   of some problem that they're having in the system,

19   in O|X or the Datatech product, which was

20   implemented as part of it.

21     Q.      Were there any JIRA tickets that you

22   issued or dealt with when you were originally

23   hired as part of A|X?

24     A.      No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

150

1        Q.      This was something unique to O|X and

2    Datatech?

3        A.      I don't know, but it was something new

4    to me.

5        Q.      Okay.  And what percentage, if you

6    can -- and if you can't, that's okay, too -- of

7    your time during this time frame -- January 1,

8    2008 to October 1, 2008 -- is there a way you can

9    tell me how much of your time over the course of

10   that time was involved in JIRA tickets and reading

11   them, responding to them, handling issues that

12   would involve in any way JIRA tickets?

13              And I'm really sort of looking for a

14   percentage.  10 percent, 90 percent, 50 percent?

15       A.      I don't know.  It would have varied.  I

16   have no idea.

17       Q.      Do you think it's a majority or less

18   than a majority of your time?

19       A.      I don't know.

20       Q.      And it talks about you providing some

21   assistance to new employees and sales people

22   learning the system.  Is that -- when you were

23   describing training MediaBank employees, that's

24   what you are referring to there?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

151

1      A.      Yes.

2      Q.      Then, if you look at the next sentence,

3  it says, "Verkuilen was assigned each project by

4  and reported to --" and it lists four people:

5  Melissa Le, Anne Marie Checcone, Allison Bhatia

6  and Karen Kaplan.

7      A.      Correct.

8      Q.      Were you dealing with all four of those

9  people at the same time or would it be one at a

10 time during this ten-month period?

11     A.      I don't remember.  There was overlaps,

12 but I don't remember the details.

13     Q.      Did you deal with any one of these

14 people more than the other that you recall?

15     A.      I don't remember.

16     Q.      Were these people -- was each one of

17 these four people -- would you consider them your

18 supervisor?

19     A.      Yes.

20     Q.      All at different times or were they all

21 four your supervisor during the entire time?

22     A.      I don't know.  I was involved with all

23 of them at multiple times overlapping.

24     Q.      Other than these four, you don't recall



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

152

1    having any other supervisor or reporting to anyone

2    during this time frame?

3         A.    No.

4         Q.    And it indicates here -- the last

5    sentence says that you worked an average of

6    approximately 50 hours per week; do you see that?

7         A.    I do.

8         Q.    How is it that you remember that?

9         A.    Because I know that I was working at

10   least 50 hours per week.

11        Q.    How is it that you know that?

12        A.    Because I know what my work/life

13   balance is, and I know what I was spending the

14   majority of my time doing.

15        Q.    What do you mean, your work/life

16   balance?

17        A.    I know how much time I spend doing

18   personal stuff and I know how much time I spend

19   doing work stuff.

20        Q.    Okay.  Do you have any documents that

21   support this statement that you were working on

22   average approximately 50 hours per week?

23        A.    No, I do not.

24        Q.    You kept no time records on your own?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

153

1     A.    I did not.

2     Q.    No calendars or diaries during this

3  time frame?

4     A.    No.

5     Q.    No separate timesheets on your own, you

6  weren't punching a clock at the company, right?

7     A.    I was not punching a clock, no.

8     Q.    During this time frame, were you

9  reporting your hours to anybody at the company?

10    A.    We were reporting hours while we were

11  onsite via those timesheets that were shown to you

12  in our discovery.

13    Q.    Right.  Well, we produced those.

14    A.    Right.

15    Q.    You don't have any of your own?

16    A.    No, I do not.

17    Q.    Were you -- during this entire

18  ten-month period, were you tracking those

19  timesheets for the entire ten months?

20    A.    I believe so.  I don't remember.  I

21  don't know.

22    Q.    But now this answer here -- this

23  statement here in your interrogatories that you

24  were working on average approximately 50 hours per



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

154

1   week during the time frame --

2       A.    Right.

3       Q.    -- that's not based on those timesheets

4   that we produced, right?

5       A.    No, because those hours did not

6   necessarily include hours I was at the StarCom

7   office or the MediaBank office.

8       Q.    Okay.  No, that's a not really what I

9   was getting at, not whether those timesheets were

10  accurate.

11           What I was asking you was:  You weren't

12  relying on those timesheets in order to make that

13  statement?

14      A.    No, I was not.

15      Q.    That's just your recollection?

16      A.    Correct.

17      Q.    And you don't remember what time you

18  got in in the morning to the client?

19      A.    I do not, by 9:00 a.m.

20      Q.    Do you remember what time you left?

21      A.    It depended.

22      Q.    Was there an average?

23      A.    There was an average of 50 hours per

24  week during the period of --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                          FEBRUARY 25, 2010

155

1    Q.    No, was there an average time that you

2    left?

3    A.    No.

4    Q.    And while you were at the client's,

5    there wasn't any mechanism for you to track your

6    time while you were there, right?

7    A.    No, there wasn't.

8    Q.    You do recall, however, the time period

9    that you claim you were working during this ten

10   months to be less than the time period for the

11   previous three months, from October 2007 to

12   December 2007, right?

13   A.    Yes, I do.

14   Q.    That's based on what?

15   A.    Based on where the company was and what

16   was happening inside of MediaBank.

17   Q.    Explain that.  What do you mean?

18   A.    We were busy because we were releasing

19   a new product in the fall.  Come January 1 it was

20   live to the client.  From my understanding, it

21   took six months create something that should have

22   taken a much longer period of time.

23   Q.    What do you mean by that?

24   A.    That's just what I heard from people in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                FEBRUARY 25, 2010

156

1    the MediaBank office.

2         Q.    You mean it was done quicker?

3         A.    Yes.

4         Q.    And was there ever anything else you

5    heard about how it was done quicker?

6         A.    No, I did not.

7         Q.    Now, during this time frame and during

8    the time period before -- the three months before

9    where you say you were working 60 hours a week and

10   here you say you were working 50 hours a week; do

11   you see that?

12        A.    Yes, I do.

13        Q.    You did not receive any overtime pay,

14   right?

15        A.    I did not.

16        Q.    Did you request any?

17        A.    No, I did not.

18        Q.    How come?

19        A.    I don't know.

20        Q.    Did you think you were entitled to it?

21        A.    I didn't think about it.

22        Q.    You had no thought at all while you

23   were working about whether or not you were

24   entitled to overtime?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

                                157
1          A.     I did not.

2          Q.     So you say you were working 60 hours a

3    week for three months and never once asked anybody

4    about overtime pay?

5          A.     I did not.

6          Q.     Same thing with the time period where

7    you say you were working 50 hours a week for ten

8    months; do you see that?

9          A.     Yes.

10         Q.     You didn't ask anybody about overtime

11   pay?

12         A.     I did not.

13         Q.     Did you think you were entitled to it?

14         A.     I didn't think about it.

15         Q.     Okay.  Can you read the next paragraph

16   and just tell me when you're done.

17         A.     "October 1 to December 31"?

18         Q.     Yes.

19         A.     I'm done.

20         Q.     So during this three-month time period,

21   you say you were doing the same things, but now

22   you were at MediaBank's Chicago offices; is that

23   right?

24         A.     That's correct.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

158

1        Q.      So what changed?  How come you weren't

2    onsite anymore?

3        A.      To my understanding, the onsite support

4    to the client had ended and we could go back to

5    the MediaBank office.

6        Q.      Okay.  When you were back at the

7    MediaBank office, did you have a desk that you sat

8    at?

9        A.      I did.

10       Q.      Did you have your own office or out in

11   sort of a main area?

12       A.      Main area.

13       Q.      And who sat near you?

14       A.      I'm trying to think.  From October to

15   December I don't remember.

16       Q.      Okay.  When -- you say you conducted

17   many of the same tasks; do you see that?

18       A.      Yes.

19       Q.      But that wouldn't include any onsite

20   training, right?

21       A.      I would still go to onsite training for

22   clients, yes.

23       Q.      Just not as much as you were doing

24   before?



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                FEBRUARY 25, 2010

159

1      A.      Correct.

2      Q.      Okay.  And at this point in time, is it

3  correct that you were reporting only to Karen

4  Kaplan or Drew Kane?  Because that's what it says

5  here.

6      A.      That is my understanding, yes.

7      Q.      When you say that was your

8  understanding, I'm just asking --

9      A.      That's what I remember.  When I created

10  this document, I was still forced to go off my

11  memory.  I remember it being Drew Kane and Karen

12  Kaplan, and that's all I remember.

13      Q.      No longer the other three people that

14  you mentioned above?

15      A.      That's correct.

16      Q.      Okay.  Now, you indicate here that you

17  reported to them at the end of each project.  What

18  does that mean, "at the end of each project"?

19      A.      After a training I would talk to Karen.

20      Q.      Talk to her about what?

21      A.      Just -- she would typically ask how the

22  training went.  We were asked to collect user

23  evaluation sheets, things like that.

24      Q.      You conducted the training on your own?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

160

1      A.      I did.

2      Q.      She wasn't there with you?

3      A.      No, but she scheduled it.

4      Q.      But you handled the training session?

5      A.      That's correct.

6      Q.      You decided what to do during the

7  training session?

8      A.      No, that's not correct necessarily.

9      Q.      Who decided?

10     A.      It depended on the client and it

11 depended on the training manager.

12     Q.      Okay.  Who was a training manager?

13     A.      Karen Kaplan, at one point Drew Kane,

14 at one point Alison Bhatia.

15     Q.      But they didn't conduct these training

16 sessions with you?

17     A.      Not typically, no.

18     Q.      Okay.  You conducted these on your own

19 or with someone else in a similar position?

20     A.      I don't know.

21     Q.      Okay.  Would you decide -- at any point

22 in time, were you making decisions on how to

23 conduct that training session?

24     A.      What kind of decision?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

                              161

1      Q.     Decisions on how to go about training

2   the client, the best way to train the client, the

3   best way to get your point across, the way to

4   train the client effectively.

5           I mean, I don't really -- you sort of

6   did the training, so what I'm trying to ask you

7   is:  Were you deciding at any point in time during

8   these training sessions what to do, how to do it,

9   making those decisions on your own?

10     A.     No.

11     Q.     Never?

12     A.     I don't know about never, but I was not

13  making those decisions all on my own, no.

14     Q.     I didn't ask you if you were making

15  them all on your own.  I said:  At any point in

16  time, were you making those decisions on your own?

17     A.     But doesn't "on your own" equal "all on

18  your own"?

19     Q.     No.

20     A.     What's the difference?

21     Q.     I didn't say every time were you making

22  the decision on your own.  I'm saying:  At any

23  point in time while you were doing these training

24  sessions, were you making decisions on how to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

                                    162
1    conduct them?

2         A.    I assume so, yes.

3         Q.    Okay.  How were you able to make those

4    decisions?

5         A.    I need an example of what kind of

6    decision you are asking about.  I mean there's

7    simple things, and I don't know where your

8    question is going, so could you please rephrase?

9         Q.    Well, it's tough for me to rephrase it

10   because I'm not sure.  Give me examples of what

11   you did and we'll go through them.

12        A.    I ran training sessions based on an

13   agenda that had been pre-established within the

14   organization by somebody.

15        Q.    What was in that agenda?

16        A.    A list of topics to cover.

17        Q.    But you decided how to do the training

18   of those topics?

19        A.    Not necessarily.  I had been trained

20   internally.

21        Q.    You had been trained on how to train

22   the client?

23        A.    Yes.

24        Q.    And so you were able to go out and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

163

1    train the client based on the training you had,

2    right?

3         A.    Please rephrase the question.

4         Q.    I'll rephrase it.  Or are you asking

5    her to just read it back?

6         THE WITNESS:  You can just read it back, if

7    you don't mind.

8                   (WHEREUPON, the record was

9                   read by the reporter.)

10   BY THE WITNESS:

11        A.    That's a statement asking me if I agree

12   with your statement.  I don't think that I do

13   completely agree with your statement, no.

14   BY MR. LEFKOFSKY:

15        Q.    What part of it don't you agree with?

16        A.    I don't agree that that was always the

17   case.  Sometimes it may have been, sometimes it

18   wouldn't have been.  It's not 100 percent.

19        Q.    Okay.  But there were times where you

20   decided, based on your training, how to train that

21   client on your own?

22        A.    I don't remember, no.  I don't know.

23        Q.    Okay.  Is it possible that you made

24   those decisions on your own during the time that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

164

1   you were training clients?

2        MR. WASSERMAN:  Objection.

3   BY THE WITNESS:

4        A.    I don't know.

5        MR. WASSERMAN:  The question calls for

6   speculation, but you can answer.

7   BY MR. LEFKOFSKY:

8        Q.    Karen Kaplan and Drew Kane weren't with

9   you at those training sessions, right?

10       A.    No, they were not.

11       Q.    And did the agenda that you received

12  indicate to you step by step how to train the

13  client?

14       A.    No, it did not.

15       Q.    So you had an agenda of what to train

16  the client on, correct?

17       A.    Yes.

18       Q.    Then you made the decision on how to go

19  about that training, correct?

20       A.    We followed procedures we had at

21  internal trainings.  We did crossover trainings.

22  There were lots of internal steps to prepare me

23  for the training of my clients.

24       Q.    Okay.  You went through those steps and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

165

1    learned how to do it, right?

2        A.     Yes.

3        Q.     And after you learned how to do it you

4    were able to do it on your own, right?

5        A.     If you mean that no one accompanied me,

6    in some cases, yes, that's correct.

7        Q.     Okay.  And it says that during this

8    time you worked an average of approximately 45

9    hours a week?

10       A.     Correct.

11       Q.     And how do you remember that?

12       A.     The same as the others.

13       Q.     Well, this is a five-hour difference

14   from the previous ten months, so what is it in

15   your mind that triggers this five-hour difference

16   so that instead of working 50 hours a week for ten

17   months you now specifically remember that it

18   dropped down by five hours a week?

19       A.     I was no longer at the client site.

20   JIRA tickets had reduced significantly as the

21   application became more stable and the users were

22   able to complete their tasks.

23       Q.     That's how you recall your decrease in

24   hours?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                      FEBRUARY 25, 2010

166

1        A.      Yes.

2        Q.      Do you remember what time you came in

3    to work during this time frame?

4        A.      9:00, 9:15, 8:45.  It depended.

5        Q.      Do you remember what time you left the

6    building?

7        A.      No, I do not.  Between 5:00 and 7:00,

8    8:00 o'clock at night.  It could depend.  Varies.

9        Q.      On most nights was it closer to 5:00 or

10   was it closer to 7:00 or 8:00 o'clock?

11       A.      I don't remember.

12       Q.      And you didn't punch any clocks during

13   this time?

14       A.      I did not.

15       Q.      Don't have any time records of your own

16   during this time frame?

17       A.      I do not.

18       Q.      And during this time frame, were you

19   still preparing timesheets at the request of

20   somebody from MediaBank for the customer?

21       A.      Only for the customer, and the hours

22   were significantly reduced.

23       Q.      Is it possible during this three-month

24   time frame that you had weeks where you worked



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

167

1    less than 40 hours?

2         MR. WASSERMAN:   Objection, the question calls

3    for speculation.   You can answer it.

4    BY THE WITNESS:

5         A.    I don't know.

6    BY MR. LEFKOFSKY:

7         Q.    You don't know if it's possible?

8         A.    I don't know.

9         Q.    If you take the previous ten months --

10   January 1, 2008, to October 1, 2008 -- I'm going

11   to ask you the same question:   Is it possible

12   during that time frame you had weeks where you

13   worked less than 40 hours a week?

14        A.    I don't know.

15        MR. WASSERMAN:   Again, for the record, calls

16   for speculation.

17   BY MR. LEFKOFSKY:

18        Q.    I'm going to ask you the same question

19   for the period of time from October 1, 2007, to

20   December 31, 2007:   Is it possible that you had

21   weeks during that time frame where you worked less

22   than 40 hours a week?

23        A.    I don't know.

24        Q.    Can you do me a favor and read the next



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

168

1    paragraph.   It starts at the bottom of page 4 and

2    goes to the top of page 5.

3         A.    Okay.

4         Q.    This takes us from the period of

5    January 1, 2009, through your termination, which

6    we know was toward the end of March 2009, right?

7         A.    That's correct --

8         Q.    Okay.

9         A.    -- 3-20-2009.

10        Q.    I'm sorry.  What was that?

11        A.    3-20-2009.

12        Q.    Okay.  And it says here that you were

13   now splitting your time between the A|X system and

14   the O|X system?

15        A.    That's correct.

16        Q.    This is the same A|X system you began

17   working on when you were first hired?

18        A.    That's correct.

19        Q.    So what was it during this time frame

20   that required you to go back and start working

21   again with the A|X system?

22        A.    It was my interest.

23        Q.    It was your desire so do so?

24        A.    Yes, it was.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

169

1    Q.    Who did you state that desire to at the

2    company?

3    A.    Jay Lawrence, my old boss, and possibly

4    other people.  I just don't remember who.

5    Q.    Why is it that you wanted to go back --

6    "go back" is the wrong term.

7          Why is it that you wanted to now, after

8    this amount of time, work with the A|X system

9    again?

10   A.    Because it's what I went to that

11   company to do.  And as my role changed into the

12   operating system, I didn't want to work in the

13   operating system.  I wanted to work with media.

14   Q.    Which is really more what A|X did?

15   A.    Yes.

16   Q.    And your request to do that, to work

17   more with the A|X system, was granted by

18   MediaBank?

19   A.    Yes, it was.

20   Q.    And so tell me what was different

21   about -- if you can, what was different about the

22   work you did with the A|X system versus the work

23   you did with the O|X system.

24   A.    With the A|X system I also had access



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

170

1    to the ad server, and I would load creative for

2    the client.

3          Q.    You had --

4          A.    I had a login and a password.

5          Q.    Yeah.  I'm sorry.  Let me break that

6    down before you go any further because I'm going

7    to lose track of it.

8                You had access to the access server you

9    said?

10         A.    To the ad server.

11         Q.    To the ad server.  What does that mean?

12         A.    It delivers ads to the Internet sites.

13         Q.    So you now you had access to that?

14         A.    Not to the server itself, but to a

15   login, a user interface on a computer for it, yes.

16         Q.    Is that something you wanted to work

17   with?

18         A.    Yes, it is.

19         Q.    Okay.  And tell me what you did in

20   performing the function working with that server?

21         A.    I received a creative from the client.

22   I typed -- logged into the user interface.  I

23   uploaded the "jpg" or whatever the file format was

24   in order for it to serve ads on web sites.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

171

1      Q.      Would you say that performing those

2   functions required more or less or the same amount

3   of skill as working with the O|X system that you

4   were doing?

5      A.      I don't know.  It's different.

6      Q.      Different skill?

7      A.      Yes.

8      Q.      Different skill set?

9      A.      Yes.  Not completely, but sort of, yes.

10     Q.      But you didn't have to be trained on

11  it?

12     A.      That's not true.  I was trained on that

13  by another internal employee.

14     Q.      Starting January 2009?

15     A.      Around there.  There had been some

16  overlap throughout.

17     Q.      Who trained you?

18     A.      Gary -- I don't remember his name.

19     Q.      Was it relatively simple for you to

20  peck up or fairly complicated?

21     A.      I don't remember.

22     Q.      And what else did you do at A|X that

23  was different?  You mentioned something else, do

24  you recall, besides the ad server?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

172

1      A.      No.   I think that was the only thing I

2   was going to say.

3      Q.      Okay.   Now, it also says here -- I want

4   to know what you mean by this -- you were a

5   liaison or a middleman between MediaBank's

6   programming and development teams on the one hand

7   and its clients on the other hand; do you see

8   that?

9      A.      Yes.

10     Q.      Explain that role.   What did you do?

11     A.      I received information from the client

12   that I shared internally.

13     Q.      To whom?

14     A.      To developers.

15     Q.      For what reason?

16     A.      For changes to the system.

17     Q.      So you would get the information from

18   the customer and share that with development?

19     A.      That's right.

20     Q.      And what would development do with it?

21     A.      In some cases I have no idea.   In most

22   cases I have no idea.

23     Q.      Okay.   But in some cases you do have an

24   idea?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8040
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN

FEBRUARY 25, 2010

173

1     A.    Right.

2     Q.    What did they do in the cases you do

3  have an idea?

4     A.    The functional spec is the most

5  specific example that I can provide you, and I

6  never saw those to fruition, so I don't really

7  know what they did with them.

8     Q.    Okay.  We'll get to those in a minute.

9         When you say you were liaison or

10  middleman, are you referring to the creation of

11  the functional spec?

12     A.    No, I am not.

13     Q.    Okay.  Because you mentioned the

14  functional spec, so I'm wondering how that fits in

15  with what this says, with --

16     A.    I was providing an example for the

17  question that you're, I think, asking me.

18     Q.    Okay.  So you would provide input from

19  the customer to development?

20     A.    Yes.

21     Q.    In order to make changes to the

22  software?

23     A.    Sometimes.

24     A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

174

1      Q.     Were those changes made?

2      A.     I don't know.

3      Q.     Okay.  Did you ever see through to the

4  customer and verify whether or not those changes

5  were made?

6      A.     I don't remember.

7      Q.     Okay.  How did you view the performance

8  of that responsibility of getting that information

9  from the customer to development to make changes

10 to the software?  Did you think that was important

11 to MediaBank's business?

12     A.     Yes.

13     Q.     Why?

14     A.     Because it kept the customers happy.

15     Q.     Because -- and MediaBank's core

16 business was software that serves the customer,

17 right?

18     A.     That's right.

19     Q.     And it still talks about JIRA ticketing

20 during this time frame.  You were still involved

21 in that?

22     A.     Yes.

23     Q.     Now, here it says at the end you worked

24 an average of 40 hours a week, right?  Do you see



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

175

1    it at the last sentence?

2         A.    I do see it.

3         Q.    And you weren't keeping any time

4    records at that point, right?

5         A.    I was not.

6         Q.    You weren't tracking your hours at all

7    from -- your work hours, your time at work,

8    correct?

9         A.    I was not tracking.

10        Q.    You weren't keeping timesheets?

11        A.    I was not.

12        Q.    How do you remember what you were

13   working during that time frame?

14        A.    I don't know.

15        Q.    Is it possible that during this time

16   frame you had weeks where you worked less than 40

17   hours?

18        MR. WASSERMAN:   I object to the --

19   BY THE WITNESS:

20        A.    I don't know.

21        MR. WASSERMAN:   -- form of the question

22   because it calls for speculation.

23   BY MR. LEFKOFSKY:

24        Q.    You don't know, right?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

176

1      A.      That's correct, I don't know.

2      Q.      Do me a favor.  Can you read the last

3  paragraph of this answer.  It starts with

4  "Throughout the entire time."  Do you see that?

5      MR. WASSERMAN:   Right here (indicating).

6  BY MR. LEFKOFSKY:

7      Q.      Just read that.  And then when you're

8  done let me know.

9      A.      Okay.

10      Q.      Okay.  You state here that you never

11  exercised any discretion or independent judgment

12  about how the A|X system or O|X system would

13  function, right?

14      A.      Yes.

15      Q.      Is that true?

16      A.      To my knowledge it is true, yes.

17      Q.      Okay.  Tell me what knowledge you are

18  basing that on.

19      A.      On my day-to-day responsibilities over

20  the course of my employment.

21      Q.      Well, as part of the course of your

22  employment that we just discussed, you were

23  involved in handling customer issues, concerns and

24  problems with the functionality of that system --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

177

1    both those systems, right?

2         A.    Yes.

3         Q.    And you would figure out ways to

4    resolve those problems, right?

5         A.    Sometimes, yes.

6         Q.    If you could on your own?

7         A.    Yes, sometimes.

8         Q.    Without any supervision, correct?

9         MR. WASSERMAN:   I object to the form of the

10   question.

11   BY MR. LEFKOFSKY:

12        Q.    Correct?

13        A.    Please restate the question.

14        Q.    Yeah.  You were able to figure out

15   those resolutions and those solutions at times

16   without any supervision from anyone, right?

17        MR. WASSERMAN:   Again, I object.  It's a

18   compound question.  But if you can answer it, feel

19   free.

20   BY THE WITNESS:

21        A.    I don't understand the question.

22   BY MR. LEFKOFSKY:

23        Q.    Were you able at any point in time to

24   figure out solutions to customer problems on your



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

178

1    own without seeking the advice of anyone else?

2         A.    It depends on the problem.

3         Q.    Were there problems that you were able

4    to resolve on your own without seeking the advice

5    of anyone else?

6         A.    I don't remember.

7         Q.    You don't recall any?

8         A.    I don't remember specific examples, no,

9    I do not.

10        Q.    I'm not asking you that.  I'm asking if

11   you recall at any point in time resolving any

12   customer problem, complaint or concern on your own

13   without going to anyone else at the company first.

14        A.    I don't remember.

15        Q.    Now, you just testified earlier that

16   you would get customer concerns or complaints

17   about changing the functionality of that software

18   and you would pass it on to development, right?

19        MR. WASSERMAN:  I object to the form --

20   BY THE WITNESS:

21        A.    I don't know if that's what I

22   testified.

23        MR. WASSERMAN:  -- of the question.  You are

24   mischaracterizing her testimony.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

179

1      MR. LEFKOFSKY:  Okay.

2   BY MR. LEFKOFSKY:

3      Q.    Did MediaBank's customers ever come to

4   you with problems they were having with the

5   system?

6      A.    Yes.

7      Q.    And were there times that you took

8   those complaints or concerns and passed them on to

9   the development team?

10      A.    Yes.

11      Q.    And was the intent when you did that so

12   that the development team would create a solution

13   or a different type of software to resolve the

14   problem?

15      A.    Or to determine -- yes, but also to

16   determine if it was a problem with the current

17   coding.

18      Q.    Okay.  Did you ever assist development

19   in doing that?

20      A.    No, I did not.

21      Q.    Development never asked your opinion on

22   any of that?

23      A.    Not that I recall, no.

24      Q.    Did you ever recommend to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

180

1    development team ways to modify the software so

2    that it would meet the customer's needs?

3         A.    Not that I remember, no.

4         Q.    Are you saying no, you didn't, or you

5    don't recall?

6         A.    I don't recall.

7         Q.    Now, it says here you did not write

8    computer or software code and did not make changes

9    to the application.  But you did testify earlier

10   that you created functional specifications, right?

11        A.    Yes.

12        MR. WASSERMAN:  I object to the form of the

13   question.

14   BY MR. LEFKOFSKY:

15        Q.    And what was the purpose of those?

16   What was the purpose of the functional

17   specification?

18        A.    The purpose of the functional

19   specification was to take information I received

20   from the client and put it into terms that

21   development could understand.

22        Q.    So that development could do what with

23   it?

24        A.    Implement the new functionality, create



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

181

1    the new functionality and implement the new

2    functionality.

3         Q.    By writing computer or software code?

4         A.    I assume so.  I don't know.

5         Q.    Okay.  So by creating functional

6    specifications, isn't it true that you actually

7    assisted development in creating computer or

8    software code to meet the client's needs?

9         A.    I don't know.

10        Q.    It says here that you didn't have to

11   have any specialized knowledge in computer

12   systems, analysis, programming or software

13   engineering, right?

14        A.    It does say that, yes.

15        Q.    Well, clearly you had to have some

16   knowledge of software and computers and technical

17   issues that you were dealing with on a daily

18   basis, right?

19        MR. WASSERMAN:  I object to the form of the

20   question.  I don't even know if it's a question.

21   BY MR. LEFKOFSKY:

22        Q.    You can answer it.

23        MR. WASSERMAN:  If you think you can answer

24   it.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

182

1    BY THE WITNESS:

2        A.    It's no different than having Excel

3    experience or Outlook experience or knowing how to

4    use your Outlook.

5    BY MR. LEFKOFSKY:

6        Q.    So what you did for 18 months at

7    MediaBank you're saying is no different than using

8    a Microsoft Outlook program?

9        A.    No.   I'm saying that my experience that

10   came from using those applications is applicable

11   to my experience at MediaBank.   And as a user of

12   software it was an easy transition from one to the

13   other.

14       Q.    Was MediaBank software, in your

15   opinion, more complex than the Microsoft software

16   you are referring to?

17       A.    I don't know.

18       MR. LEFKOFSKY:   Why don't we take a

19   five-minute break.   I'm going to get through

20   everything I can in the next hour or so, and then

21   we'll just figure out a time to wrap up another

22   time because I won't finish in the next hour.

23       MR. WASSERMAN:   We've got two.

24       MS. BALSON:   Three.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

183

1        MR. WASSERMAN:  We started at 11:00, so I

2    want to finish today.

3        MR. LEFKOFSKY:  We're not going to.  I told

4    you I'm not going more than -- we started at 9:00.

5    We're stopping at 4:00, which is seven hours.

6        MR. WASSERMAN:  We are stopping at 5:00

7    according to your e-mail, Steve.

8        MR. LEFKOFSKY:  No, no.  That's not what my

9    e-mail said.  My e-mail said we'll go seven hours

10   today.  I'm not going in depositions longer than

11   seven hours.  You agreed to that.

12       MR. WASSERMAN:  What I've agreed to is seven

13   hours, correct.

14       MR. LEFKOFSKY:  We started at 9:00 --

15       MR. WASSERMAN:  Excuse me for a second.  We

16   started at 9:00, and I was done by 11:00.

17       MR. LEFKOFSKY:  That doesn't matter to me.

18       MR. WASSERMAN:  That was two hours.

19       MR. LEFKOFSKY:  Great.  I don't care.  I'll

20   go to 4:30.  I have no problem.  At that point in

21   time we've hit seven hours.  I'm not going beyond

22   that because I'm not going to finish in three

23   hours.

24       MR. WASSERMAN:  Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

184

1    LEFKOFSKY:  I'm entitled to seven hours with

2    the witness.  We are not going to get there today.

3        MR. WASSERMAN:  That's fine.

4        MR. LEFKOFSKY:  So we'll go until 4:30.  I'm

5    fine with that.  Then, to the extent I'm going to

6    come back, great.  If I decide not to, I'll tell

7    you I'm not going to.

8            But I'm not going to get through

9    everything I need to, so I'll make the decision

10   whether or not I want to come back and do her.  If

11   that's the case, we'll come back, we'll sit down

12   for two hours and we'll finish it.

13       MS. BALSON:  What does that mean about

14   handling our portion?

15       MR. LEFKOFSKY:  What do you mean, handling

16   your portion?

17       MS. BALSON:  You make it sound as though

18   we're going to wrap things up, and then you at

19   some later point will decide if you want to come

20   back or not.  But we have the ability to interview

21   our client with questions.  Does that happen

22   today?

23       MR. LEFKOFSKY:  You tell me.

24       MS. BALSON:  We don't want to go through the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

185

1   expense in bringing her back if it's just for our

2   questions because we're happy to work until 5:00.

3   We actually work until 5:00 on a fairly regular

4   basis.

5          MR. LEFKOFSKY:  Yeah, I'm sure you do.  See,

6   what we're going to do is -- if you want to go and

7   ask her today, I don't care.  I will reserve mine

8   for later.  Do you want to take time and do her

9   now?

10         MR. WASSERMAN:  How about we take the break

11  and let's see what happens.  Take your five

12  minutes.  We can deal with it.  I don't want to --

13  we made an agreement.  If you want to do what you

14  can to finish, whatever.  I don't want to fight

15  about it.  It doesn't matter.  You are entitled to

16  your seven hours; you'll get them.

17         MR. LEFKOFSKY:  I'm going to get through as

18  much as I can between now and 4:30 Chicago time.

19  At that point in time I'm going to stop.  If I

20  decide not to come back -- believe me, I'm not

21  looking to make another trip here.

22         MR. WASSERMAN:  It's fine.  That's why I say,

23  take your break.  You get your seven hours.  If

24  you want them you'll use them.  If not, you won't.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

186

1    It's fine, whatever.

2          MR. LEFKOFSKY:   If you want time after

3    that -- I don't care if you want to question her

4    when we're done.   It's fine with me.

5          MR. WASSERMAN:   Okay.   We can go off the

6    record.

7                     (WHEREUPON, a recess was had.)

8          MR. WASSERMAN:   I just want to put one thing

9    on the record.   To the extent that you want to

10   stop at 4:30, that's fine.   You mentioned --

11   correct me if I'm wrong -- that you're not sure

12   whether you are going to need to come back or not.

13   Whatever, you'll have to make that decision later.

14   I can appreciate that.

15              With that being said, since we are here,

16   to the extent we decide to do some redirect, it

17   will be very minimal and I'd like to do it today.

18         MR. LEFKOFSKY:   I'm okay with that.   If you

19   can give me an idea how much time you have I'll

20   stop.

21         MR. WASSERMAN:   Maybe 15 minutes.

22         MR. LEFKOFSKY:   Great.   I'm going to go until

23   4:15, I'll give you 15 minutes, and then I'm going

24   to head out of here.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

187

1        MR. WASSERMAN:  I'm not trying to preclude
2    you from coming back.
3        MR. LEFKOFSKY:  Listen, you've given me the
4    right to come back.  I don't want to.  If I make a
5    decision I don't need to I won't.  If I do, we'll
6    pick a time that's convenient and we'll do it for
7    two hours and we'll be done.
8        MR. WASSERMAN:  We're on the same page.
9    Let's proceed.
10       MR. LEFKOFSKY:  I have no problem.  If you
11   want to go for 15 minutes I'll stop and give you
12   the chance to do it.
13       MR. WASSERMAN:  That's fine.  Let's just
14   proceed.  We'll see where we go.
15               (WHEREUPON, a certain document
16                was marked Exhibit No. D-10, for
17                identification, as of 2-25-10.)
18   BY MR. LEFKOFSKY:
19       Q.   Ms. Verkuilen, can you take a look at
20   that.  We've had it marked in the case a few
21   times, so I'm sure you are familiar with it.  Just
22   take a look at it.
23               What I'd like to ask you to do if you
24   can is there's a section on here that starts with


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

188

1    "Responsibilities include, but are not limited

2    to."

3         A.    Correct.

4         Q.    It goes to the next page and it ends at

5    "required skills" on the second page.  Do you see

6    where it ends with "required skills"?

7         A.    I do.

8         Q.    What I really would just like you to do

9    is tell me which one of these that are identified

10   here on the responsibilities of an account

11   manager, which was your job title, is something

12   that you did not do during the time you were at

13   MediaBank.  If you can tell me on here, not what

14   you did do, but what you didn't do, I'd like to

15   know.

16        MR. WASSERMAN:  If you need to, you can mark

17   on it.

18        THE WITNESS:  I have a pen.

19             Okay.  I've read the document.

20   BY MR. LEFKOFSKY:

21        Q.    Okay.  I'm just wondering if you can

22   point out to me in the section that says,

23   "Responsibilities include, but are not limited to"

24   at the bottom of the first page and goes to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN
FEBRUARY 25, 2010

189

1    midway point of the second page which one of those

2    identified responsibilities is something you did

3    not do while you were an employee at MediaBank, if

4    any.  I'm not telling you there are some.  I'm

5    wondering if you think you didn't do any of these.

6         A.    I don't believe I was involved in

7    quality control.

8         Q.    Where do you see that?

9         A.    The third bullet under

10   "Responsibilities include, but are not limited

11   to."

12        Q.    Responsibility for quality control, so

13   you don't think you did that?

14        A.    I don't.

15        Q.    Were you responsible for timely

16   delivery of client work, including final review of

17   all data updates and plan support and participant

18   reporting as a result of daily activity?

19        A.    As it is stated there, no, I do not

20   agree with that statement.

21        Q.    Why?

22        A.    Because timely delivery of client work

23   could include a lot of things that may not have

24   been -- and it's also tied to quality control, so



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com