190

1    I don't know that I agree to that responsibility

2    as an account manager in my position at MediaBank.

3        Q.    You mean you don't know if you did it?

4        A.    That's correct.

5        Q.    In fact, you're saying to your

6    recollection this is not something you did do,

7    correct?

8        A.    Yes.

9        Q.    Anything else?

10       A.    Testing software applications.  I mean,

11   I wouldn't say that I tested it.  I would say I

12   played with it.  I would say I entered in data to

13   make sure the end result was what I entered in.

14             I did not identify or implement

15   opportunities for increased operational

16   efficiencies.  Well, I thought that said

17   "financial efficiencies."  Operational --

18       Q.    So that one is accurate?

19       A.    I don't know.

20       Q.    You don't remember if you did that?

21       A.    I don't know if it applied to my job

22   duties as an account manager at MediaBank --

23       Q.    Yeah.  I'm saying --

24       A.    -- while I was there.  I'm not sure


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

191

1    that was an accurate statement.

2         Q.    Is it fair to say you don't recall

3    having performed that duty?  Or "Do you recall

4    having performed it?" is really what I'm asking.

5         A.    Increased operational efficiencies.

6    I'm going to say that's not accurate.

7         Q.    Okay.  Why is that?

8         A.    It just -- well, it could just be the

9    verbiage used, but -- "increased operational

10   efficiencies."  It's vague.  I don't know that

11   that's something I was doing.

12        Q.    Okay.  But you were involved, weren't

13   you, while you were employed at MediaBank in the

14   operational efficiencies of the software?

15        A.    As it pertained to users, yes, I was.

16        Q.    Okay.

17        A.    And I also did not identify billable

18   services and effectively communicate that to the

19   client.  That was done by the training manager or

20   my manager.

21        Q.    So just those items you have

22   identified?  Because that takes us to the end.

23        A.    Yes, I believe so.

24        Q.    Just real quick, you said you don't



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

192

1    think you were involved in testing software

2    applications?

3           A.     No, I do not.

4           Q.     But were you involved in testing

5    solutions to software problems that the client

6    relayed to you once those solutions were handed

7    down to you from development?

8           MR. WASSERMAN:   I object to the form of the

9    question.   It's compound.   You can answer it.

10   BY THE WITNESS:

11          A.     I was responsible for reproducing the

12   issue and then, if I could reproduce the issue,

13   either going back to the user to explain how they

14   were misusing the software or going to development

15   and explaining what the problem was and what the

16   end result the client wanted was so that they

17   could fix the system.

18   BY MR. LEFKOFSKY:

19          Q.     Okay.   Now, there were a number of

20   things that you did not -- that you did not

21   indicate you did not do.   That's a poor way of

22   saying it.

23          The rest of the items on this list, you

24   agree those were part of your responsibilities and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

193

1   duties at MediaBank?

2       A.    With the brief review that I did of the

3   document, it appears to be fairly accurate, yes.

4       Q.    Okay.  And how important was the

5   performance of these duties with respect to

6   MediaBank's business, in your opinion?

7       A.    I don't know.

8       Q.    Do you think it was important that

9   these duties were performed and performed

10  accurately?

11      A.    Yes.

12      Q.    Okay.  And during the performance of

13  some or all of these duties, were you exercising

14  your own independent discretion and judgment in

15  performing these tasks?

16      A.    I don't remember.

17      Q.    Okay.  Let's mark this.

18              (WHEREUPON, a certain document

19              was marked Exhibit No. D-11, for

20              identification, as of 2-25-10.)

21  BY MR. LEFKOFSKY:

22      Q.    Let me ask you one question and then

23  I'll have you take a quick look at what we've just

24  marked as an exhibit.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

194

1          If you did not perform -- the tasks

2    that you've identified you did perform on the

3    account manager description that we just went

4    through, if you did not perform those correctly,

5    do you think that would have an adverse financial

6    impact on MediaBank?

7          A.    I don't know.

8          Q.    You don't know?

9          A.    I don't know.

10         Q.    Okay.  Go ahead and take a look at the

11   next document that I gave to you.  It's the

12   plaintiff's Rule 26(a) disclosures.  I don't know

13   if -- have you ever seen that before?

14         A.    I have seen it.

15         Q.    Did you help your counsel in preparing

16   the responses to that that he prepared?

17         A.    I don't remember.

18         Q.    If you take a look at the bottom of

19   that first page going through the second page,

20   you'll see a number of potential witnesses or

21   people with knowledge that are identified.  Do you

22   see all those people?

23         A.    I do.

24         Q.    Can you tell me whether you have spoken



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

195

1    with anybody on that list, first, prior to filing

2    the case about your overtime claim?  So I'm asking

3    you whether you talked to anybody on that list of

4    people prior to filing the lawsuit about the claim

5    in the lawsuit.

6           A.    Prior to filing the lawsuit, no, I did

7    not.

8           Q.    Okay.  Have you talked to anybody on

9    that list after filing the lawsuit about anything

10   relating to the lawsuit?

11          A.    I was asked about the lawsuit.

12          Q.    By whom?

13          A.    By Gina Grandinetti.

14          Q.    Anyone else?

15          A.    Not that I'm aware of, no.

16          Q.    And what did you tell Gina Grandinetti

17   about the lawsuit; do you remember?

18          A.    I told her it was a wage claim.

19          Q.    And did you ask Gina Grandinetti how

20   she found out about the lawsuit?

21          A.    I did.

22          Q.    And what did she say?

23          A.    Anne Marie found it, and Anne Marie

24   told Gina.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

196

1      Q.     Anne Marie found it?

2      A.     She must have had a Google tracker or

3  something.  Anne Marie got a notification through

4  her Internet access that I had filed a lawsuit.

5      Q.     Okay.  So then she asked you about it

6  and you told her it was an overtime claim?

7      A.     Yes.  I said it was a wage dispute.

8      Q.     No other conversations besides that one

9  that you remember?

10     A.     Not that I remember, no.

11     Q.     Okay.  And other than her, you don't

12  recall having talked to anybody on that list

13  specifically about the case?

14     A.     I don't remember, no.

15     Q.     Okay.  If you go to the last page of

16  that, you'll see there's a calculation of

17  overtime.  Do you see that box?

18     A.     I do.

19     Q.     That box references for these different

20  time periods eight hours of overtime per week; do

21  you see that?

22     A.     I do.

23     Q.     But, based on your interrogatory

24  answers, we know that you are not saying every



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

197

1    week you worked eight hours of overtime, right?

2         A.    That's right.

3         Q.    You are saying some weeks you believe

4    you worked more, some weeks you didn't work any?

5         A.    Hours of overtime, correct.

6         Q.    Okay.  Did you explain that to your

7    lawyer?  Did you look at that?

8         A.    Yes, I did.

9         Q.    How did you come to answer that you got

10   eight hours of overtime a week?  That's not

11   accurate, is it?  Eight hours of overtime a week

12   for all those periods, that's not --

13        A.    That is an average of the total

14   overtime hours that we determined based on the

15   total hours I listed in my answers to

16   interrogatories, based on the periods of time that

17   we have discussed throughout the deposition this

18   afternoon.

19        Q.    Okay.  How important was it when you

20   received a customer ticket or concern or complaint

21   about the system not functioning to resolve that

22   ticket or problem quickly?  How important was

23   timing?

24        MR. WASSERMAN:  I object to the form the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

198

1   question.  It's compound.  You can answer if you

2   understand.

3   BY THE WITNESS:

4       A.    It depends on the issue and what the

5   issue impacted.

6   BY MR. LEFKOFSKY:

7       Q.    Okay.  Were there some problems or

8   tickets you received that were very

9   time-sensitive?

10      A.    I imagine so.

11      Q.    Did you believe that resolving those

12  problems quickly was important?

13      A.    Depending on the issue, yes.

14      Q.    Important for -- important from

15  MediaBank's perspective or from the customer's

16  perspective or both?

17      A.    Both.

18      Q.    And why is that?  Why is it both?  Why

19  was it important from MediaBank's perspective?

20      A.    To keep their customers happy.

21      Q.    Why was it important from the

22  customer's perspective?

23      A.    To perform their business.

24                  (WHEREUPON, a certain document



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

199

1              was marked Exhibit No. D-12, for

2              identification, as of 2-25-10.)

3        MR. WASSERMAN:  Is that all one exhibit?

4        MR. LEFKOFSKY:  Yeah.  I think it's all one

5   report.

6   BY MR. LEFKOFSKY:

7        Q.    Take a quick look at that and let me

8   know when you are done.

9        A.    I'm ready.

10       Q.    Have you ever seen that before this

11  case?

12       A.    I have.  Oh, before this case?  No.  I

13  have seen a similar screen shot of it, yes.

14       Q.    As part of this case?  Or, no, you mean

15  while you were working?

16       A.    Correct.  At MediaBank this is a

17  familiar screen to me on the computer screen.  I

18  have seen it when the documents were received by

19  counsel at this office.

20       Q.    Okay.  What is that?

21       A.    It's a list of JIRA tickets.

22       Q.    And there's a summary next to each one?

23       A.    Yes, there is.

24       Q.    Is that summary your summary?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

200

1        A.      It depends.

2        Q.      On what?

3        A.      It depends on who reported the issue.

4        Q.      So the reporter is the one who prepared

5    the summary?

6        A.      Possibly.

7        Q.      Okay.  In that JIRA ticket summary that

8    you have, the reporter is not always the same as

9    the assignee, right?

10       A.      That's correct.

11       Q.      So there were times where you were

12   assigned a ticket but didn't report it?

13       A.      That's correct.

14       Q.      Okay.  Why?  Explain that.  Why would

15   that happen?

16       A.      Because the ticket was received by

17   somebody else via phone call or via e-mail or via

18   conversation they had with somebody live on the

19   client side.

20       Q.      Somebody at MediaBank would receive a

21   ticket?

22       A.      Yes.

23       Q.      They would send it to you to try to

24   figure out how to solve the problem?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

201

1      A.      They would assign it to me, yes.

2      Q.      But how come you didn't then report it?

3   Because whoever -- whoever got the ticket

4   originally would then report it?

5      MR. WASSERMAN:   I object to the form of the

6   question.  It's compound.  I don't even understand

7   it.

8   BY MR. LEFKOFSKY:

9      Q.      Do you understand it?

10     A.      The reporter was not necessarily the

11  assignee or the resolve -- the person who resolved

12  the ticket.

13     Q.      The reporter was whoever got the ticket

14  originally?

15     A.      I would assume so, yes.

16             (WHEREUPON, a certain document

17             was marked Exhibit No. D-13, for

18             identification, as of 2-25-10.)

19  BY MR. LEFKOFSKY:

20     Q.      Do you see that?  Are you still looking

21  at it?

22     A.      Yeah.  It's fine.  I'm ready.

23     Q.      On this one you are the reporter and

24  the assignee, right?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

                              202

1        A.     That's correct.

2        Q.     So these tickets were ones that not

3    only you were the person who pulled the ticket,

4    but you actually resolved whatever problem there

5    was and then reported on it, right?

6        MR. WASSERMAN:  I object to the form of the

7    question.

8    BY THE WITNESS:

9        A.     According to what this document says,

10   that appears to be the case.

11   BY MR. LEFKOFSKY:

12       Q.     Okay.  And the summary that's in this

13   document next to the key ticket number, do you see

14   that?

15       A.     Yes.

16       Q.     Is that summary something that you

17   prepared?

18       A.     It depends.  Not necessarily.

19       Q.     Okay.  What would a case be where you

20   were the reporter and the assignee of a ticket

21   that you would not prepare the summary?

22       A.     I don't know.  These items are

23   editable, so I have no idea.

24       Q.     So you -- but you would originally



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

203

1    prepare a summary and then someone might edit it;

2    is that what you are saying?

3        MR. WASSERMAN:   That's not what she said.

4    She didn't testify to that, and you're

5    mischaracterizing her testimony.

6    BY MR. LEFKOFSKY:

7        Q.    Would you originally prepare the

8    summary?

9        A.    In most cases, yes.

10       Q.    You just don't know if anybody edited

11   this?

12       A.    I don't know.

13       Q.    And if any of these summaries were

14   edited, would it show up on here?  Would there be

15   any tracked changes?

16       A.    I don't know.

17                    (WHEREUPON, certain documents

18                    were marked Exhibit Nos. D-14

19                    through D-19, for identification,

20                    as of 2-25-10.)

21   BY MR. LEFKOFSKY:

22       Q.    Whenever you are ready to talk about

23   these, let me know.

24       A.    I'm ready.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

204

1        Q.      Okay.  You've got in front of you six
2    different exhibits, right?
3        A.      Correct.
4        Q.      And what are these?
5        A.      Functional specification D04 and D05.
6        Q.      Okay.  Let's look at the first one you
7    have in front of you.  Is that Exhibit 14?
8        A.      Yes, it is.
9        Q.      That says -- you're referring to D05 in
10   the spec ID, the last few digits of the spec ID,
11   right?
12       A.      Yes.
13       Q.      And it says "PM/owner"; do you see
14   that?
15       A.      Yes.
16       Q.      What is "PM"; do you know?
17       A.      It stands for project manager.
18       Q.      Okay.  It also has a little box shaded
19   that says "Version 0.1," right?
20       A.      That's correct.
21       Q.      Does this mean that there was more than
22   one version of this spec created?  I guess what
23   I'm wondering is:  Why would we have a version
24   number?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

205

1    A.    Because there were revisions made to

2    this through conversations with the client and

3    internal team members at MediaBank.

4    Q.    Version 1, would that be the first

5    version created?

6    A.    It should be, yes.

7    Q.    You were the project manager owner of

8    this specification?

9    A.    Yes.

10   Q.    So take a look at this document.  Did

11   you prepare this document?

12   A.    It says that I did.

13   Q.    Well, I know it says that.  I'm asking

14   you to verify that.

15   A.    It looks like my document, yeah.

16   Q.    What was the reason for preparing this?

17   A.    The reason was GM Planworks wanted a

18   feature called Upload PO from RTP implemented into

19   the MediaBank system before they came on to use us

20   as their software.

21   Q.    You said GM.  Is that the client?

22   A.    It is.

23   Q.    Okay.  So GM wanted a modification and

24   change to the software before they started using



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                FEBRUARY 25, 2010

206

1    it?

2         A.    Yes.

3         Q.    Why how is it that you prepared this

4    spec?  Was that request made to you?

5         A.    No.  Cordie DePascale assigned this

6    duty to me along with probably Drew Kane and

7    possibly Karen Kaplan.

8         Q.    Those people assigned this duty to you?

9         A.    It came from somewhere.  I didn't just

10   go out and solicit it on my own.

11        Q.    Okay.  And did you know how to create a

12   functional specification or did somebody have to

13   teach you how to do this?

14        A.    I did not know.  I was given a format.

15        Q.    By whom?

16        A.    By Cordie and Elizabeth Williamson.

17        Q.    Given a format of a previous version of

18   a specification?

19        A.    That's correct.

20        Q.    And from that you were able to create

21   this document?

22        A.    From conversations with the client I

23   was able to create this document, conversations

24   with the client and internal team members.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

207

1     Q.     Would you agree that this is a pretty

2  complex document?

3     MR. WASSERMAN:   Objection, calls for

4  speculation.

5  BY THE WITNESS:

6     A.     I think it looks like a complex

7  document.

8  BY MR. LEFKOFSKY:

9     Q.     But you are not agreeing that it is

10  one?

11     A.     I'm not agreeing or disagreeing.

12     Q.     Okay.  Take a look at page 5 of this

13  document.  You will see a high-level workflow

14  diagram.

15     A.     Yes.

16     Q.     Did you prepare that?

17     A.     I did with the client's help.

18     Q.     And the next page, page 6, Proposed

19  Workflow Solution; do you see that?

20     A.     I do.

21     Q.     And this was prepared by you, the

22  wording on here?

23     A.     It was through conversations with the

24  client and internal team members at MediaBank,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

208

1    including QA, development, possibly Cordie,

2    possibly Elizabeth Williamson, possibly Danielle

3    Casey.

4         Q.    Take a look at Exhibit 16.  Does that

5    say Version 1 for you?

6         A.    Says Version .1, yes.

7         Q.    Is this the same as Exhibit 14 or is it

8    different?  Take a look at it and let me know.

9         A.    I believe it's the same, but the one is

10   tracking the changes, the other one has already

11   accepted the changes.

12        Q.    Okay.  So one of them has tracked

13   changes, the other one just accepted them?

14        A.    That's right.  That's what I can tell

15   anyway.

16        Q.    That's fine.  Take a look at

17   Exhibit 15.  This one says Version .6, right?

18        A.    Yes, it does.

19        Q.    So is this different than the other two

20   exhibits you just looked at, 14 and 16?

21        A.    It is different because it's had

22   additional modifications or changes made to the

23   verbiage based on conversations with the client

24   and internal MediaBank team members.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                          FEBRUARY 25, 2010

209

1        Q.    And those would be changes made by you?

2        A.    Yes.

3        Q.    If you look at page 2 of the document,

4    you'll see the revision date of the changes,

5    right, do you see that?

6        A.    Yes, I do.

7        Q.    And you are the author of all of those

8    changes, right?

9        A.    It appears so, yes.

10       Q.    If you take a look at page 4, business

11   requirements, you prepared these based on

12   communications with the customer?

13       A.    The customer and internal MediaBank

14   team members.

15       Q.    How important is it that these

16   functional specifications are prepared correctly?

17       A.    I imagine that it's very important.

18       Q.    Very important for MediaBank?

19       A.    MediaBank and the client.

20       Q.    In preparing this document, DO5, it was

21   important to you that you do this correctly,

22   right?

23       A.    Yes.

24       Q.    Once this is prepared, what happens to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

                              210

1    it next?

2         A.    I don't know.

3         Q.    You don't know where it goes?

4         A.    I don't.

5         Q.    You don't know who gets it?

6         A.    No.

7         Q.    Did you send it to anybody?

8         A.    No.  I posted it on the share point

9    site where Cordie and the other management team

10   members would go and review them.

11        Q.    Do you know if there's any

12   modifications -- the point to this, as you said

13   earlier, was because the client wanted

14   modifications to the software.

15        MR. WASSERMAN:  Objection to the

16   mischaracterization of her testimony.  I mean, if

17   you want to ask her a question, ask it.  If you're

18   going to tell her what she said earlier, then

19   we're going to object.

20   BY MR. LEFKOFSKY:

21        Q.    Did you testify that the point to this

22   document, creating this document, was based on the

23   client's desire to make modifications to the

24   software?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

211

1          A.     I did testify.

2          Q.     Okay.  So do you believe that

3     modifications to the software were made as a

4     result of the creation of this document?

5          A.     I don't know.

6          Q.     But that was the intent of this when

7     you created this?

8          A.     That is the intention of a functional

9     spec, yes.

10         Q.     Was this something that you were able

11    to create in the beginning of your employment at

12    MediaBank?

13         A.     No, it was not.

14         Q.     Why is that?

15         A.     I wasn't trained.  I didn't know the

16    system, and I didn't know the customers.

17         Q.     But toward the end of your employment

18    this is something you were able to create?

19         A.     It was something that I was given to

20    create.  There was not a discussion about it.  It

21    was assigned to me.

22         Q.     And you were able to perform the duty

23    of creating it, correct?

24         A.     Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

212

1        Q.    Now, take a look at the other three

2    exhibits.  Those all reference GMPWD04, right?  Do

3    you see that?

4        A.    Yes.

5        Q.    One of those is Version 1.  What number

6    do you have that says Version 1, what exhibit?

7        MR. WASSERMAN:  18.

8    BY MR. LEFKOFSKY:

9        Q.    And the other two are Version 2, right?

10       A.    No.  One is Version .2, one is

11   Version 2.0.

12       Q.    Okay.  So would 2.0 come to after .2?

13       A.    Yes, it would.

14       Q.    And after .1?

15       A.    Yes.

16       Q.    So all three of these versions are

17   actually different?

18       A.    Yes.

19       Q.    The first version created, is that

20   always referenced as .1?

21       A.    I don't know.

22       Q.    Did you have a version earlier than

23   this .1?

24       A.    Not to my knowledge, no.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN
FEBRUARY 25, 2010

213

1    Q.    Okay.  The other versions then have

2    changes that were made to the original

3    specification, which is Version .1, right?

4    A.    I'm sorry.  Would you repeat the

5    question.

6    Q.    The other versions contain changes to

7    the original version, right?

8    A.    It appears that D17 and D19 are more

9    recent versions than D18.

10   Q.    And do you know, when you finished

11   creating this functional specification, D04, did

12   you do the same thing that you did with D05?  You

13   said you posted it.

14   A.    I did not ever complete functional spec

15   D04.

16   Q.    But you did complete D05?

17   A.    It appears, based on page 2 of the

18   document, yes, my version was the final version.

19   Q.    Okay.  How do you know you did not

20   complete D04?  What is it that tells you that?

21   A.    Page 2.

22   Q.    Of which one?

23   A.    Version 2.0.  The last revision date

24   was 2-20 with my name on it.  After that, Cordie



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                          FEBRUARY 25, 2010

214

1    picked it up at 5-26.

2         Q.    So after your termination, Cordie

3    picked it up and made other modifications to DO4?

4         A.    I don't know.

5         Q.    That's what you just said, right?

6         A.    I said that's what it said.  I don't

7    know what happened after 3-20-2009.

8         Q.    Oh, okay.  But that's what it says on

9    the document?

10        A.    That's what page 2 of Version 2.0 says.

11        Q.    Okay.  And what was the reason why you

12   created DO4?  Was it that the client wanted a

13   modification to the software?

14        A.    I was assigned it by Cordie DePascale.

15   I was given a document that had my name attached

16   to two of these items which you have in front of

17   me right now.

18        Q.    I don't follow you.  You were given a

19   document that had your name on it?

20        A.    It was an Excel spreadsheet assigning

21   it to me just like this (indicating) except it was

22   an Excel spreadsheet.

23        Q.    Okay.

24        A.    So it wasn't a discussion.  I was sent



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                          FEBRUARY 25, 2010

215

1  a document that had my name assigned as PM/owner

2  for these two functional specifications.

3          Q.    To create functional specifications?

4          A.    That's correct.

5          Q.    Which you did?

6          A.    Yes, I did.

7          Q.    Okay.  And these functional

8  specifications were assigned to you as a result of

9  a change the client wanted to the software,

10  correct?

11          A.    I don't know.

12          Q.    Did you ever talk to the client on

13  these?

14          A.    I did, yes.

15          Q.    Well, tell me about those discussions.

16          A.    The discussions were for the

17  functionality, not for why the functionality would

18  be implemented.  That would be something Cordie

19  would know or Drew would know or Karen would know.

20          Q.    In order to create the functional

21  specification, didn't you have to know why you

22  were creating it?

23          A.    No, not necessarily, I did not.

24          Q.    You didn't have to understand the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

216

1    reason why you created these functional

2    specifications in order to be able to create them?

3         A.    No, I did not.

4         Q.    Did you ever ask anybody?

5         A.    There were internal discussions and

6    discussions with the client to narrow down what it

7    needed to do, but I did not need to know what it

8    was.

9         Q.    But on the D05, you did have

10   discussions with the customer on that, correct?

11        A.    I had discussions with the customer

12   regarding both D04 and D05.

13        Q.    Oh, so you had discussions with the

14   customer on both of these?

15        A.    That's correct.

16        Q.    And did the customer indicate to you

17   what it wanted, what the problem was it was

18   having, what it wanted the software to do?

19        MR. WASSERMAN:    Objection, that's been asked

20   and answered.

21   BY THE WITNESS:

22        A.    It was predetermined.

23   BY MR. LEFKOFSKY:

24        Q.    So then what were you talking to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

217

1   customer about?

2        A.    About what the functionality needed to

3   do, what they needed the system to do that did not

4   exist in the system.

5        Q.    Why were you having those discussions

6   if it was predetermined?

7        A.    Because the language, in order for the

8   developers to create it, still needed to be

9   communicated from the client to the development

10  team.

11       Q.    Okay.  Do you have any idea what the

12  impact to MediaBank would be if the functional

13  specs were created incorrectly?

14       MR. WASSERMAN:  Objection.  That calls for

15  speculation.

16  BY MR. LEFKOFSKY:

17       Q.    You can answer the question.

18       A.    I don't know.

19       Q.    Do you have any idea what the impact

20  would be to the client if they were created

21  incorrectly?

22       MR. WASSERMAN:  Objection.  The question

23  calls for speculation.  You can answer it if you

24  can.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

218

1  BY THE WITNESS:

2       A.    I don't know.

3                  (WHEREUPON, a certain document

4                  was marked Exhibit No. D-20, for

5                  identification, as of 2-25-10.)

6       MR. LEFKOFSKY:  Matt, that has 244 on the

7  bottom of the first page?

8       MR. WASSERMAN:  Yes, it does.

9       MR. LEFKOFSKY:  I just want to make sure I'm

10  looking at the same one.

11       THE WITNESS:  Okay.

12  BY MR. LEFKOFSKY:

13       Q.    Okay.  The first page of this exhibit

14  is an e-mail chain originally from Karen Kaplan to

15  training and support.  Would that include you?

16       A.    Yes.

17       Q.    And then up on top is a response it

18  looks like from you to Karen Kaplan attaching the

19  timesheets; do you see that?

20       A.    Yes.

21       Q.    I want you to look at Karen Kaplan's

22  e-mail dated March 22.  It says, "Your March

23  timesheets are due by EOD."  I assume that's "end

24  of business," right?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

219

1        A.    Yes.

2        Q.    It says "EOD."  Is that a typo?  Do you

3   think it means "EOB"?

4        A.    I think it means "end of day."

5        Q.     "End of day on Monday so that I can

6   compile them for Anne Marie."  Okay.

7              The last sentence says, "The last week

8   of March, the week of 3-24, should be included

9   based on your anticipated schedule."  Do you see

10  that?

11       A.    Yes.

12       Q.    So you submitted these timesheets to

13  Karen Kaplan on March 24, and for that week you

14  just estimated or anticipated your schedule?

15       MR. WASSERMAN:  Objection to the form of the

16  question, compound, not what she testified to.

17       MR. LEFKOFSKY:  I didn't ask what she

18  testified to.

19       MR. WASSERMAN:  You just put words in her

20  mouth and want her to say yes or no, and I'm

21  objecting.

22       MR. LEFKOFSKY:  No.  I'm asking her when she

23  filled out the timesheet for the week of March 24,

24  "Did you estimate or guess as to what your



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                          FEBRUARY 25, 2010

                                                          220

1    time --"

2        MR. WASSERMAN:  And I'm saying she never

3    testified that she filled out any timesheet.  So

4    if you want to stick words in her mouth, I'm going

5    to object.

6    BY MR. LEFKOFSKY:

7        Q.    Did you fill out any timesheets?

8        A.    I did fill out timesheets.

9        Q.    And you sent them to Karen Kaplan,

10   right?

11       A.    Yes, I did.

12       Q.    Great.  So now let me ask you the same

13   question.

14            For the timesheet on the week of

15   March 24, did you estimate or guess as to what

16   your time would be?

17       A.    Yes.

18       Q.    Okay.  And did you ever go back and

19   verify that that was accurate?

20       A.    Yes.

21       Q.    When?

22       A.    When the week was finished.

23       Q.    And was your guess exactly accurate or

24   did you change it?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

221

1      A.     I don't know.

2      Q.     Now, what about your time for the

3  previous three weeks of March that she asked you

4  to fill out timesheets for?  You got this on March

5  22 from Karen Kaplan, right, the e-mail?

6      A.     That's what it says, yes.

7      Q.     Were you keeping track of your time

8  anywhere?

9      A.     Yeah, in these spreadsheets on our

10 desktops.

11     Q.     Okay.  So you were tracking your time

12 prior to this e-mail for the month of March?

13     A.     That's correct.

14     Q.     All right.  So when she asked you to go

15 ahead and forward it, you pulled up the timesheets

16 you had been tracking, correct?

17     A.     Correct.

18     Q.     If you look at the last page, it says

19 "Timesheet for start date March 30."  Do you see

20 that?

21     A.     I do.

22     Q.     Would that have been the week starting

23 on Sunday, March 30?

24     A.     I don't know.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

222

1      Q.    Would you have estimated your time for

2   this week?

3      A.    I don't know.

4      Q.    Now, was there any requirement by you

5   that you sign these timesheets?  Because I see

6   that the ones we have here -- in fact, all the

7   ones that we've produced in this case that we

8   found aren't signed.

9      A.    No.  They were sent electronically to

10  Karen Kaplan and Alison Bhatia in the New Jersey

11  office.

12     Q.    So you never signed any timesheets?

13     A.    Not to my recollection.

14     Q.    Did you ever see timesheets signed by

15  the client or anybody from MediaBank?

16     A.    Not that I remember, no.

17     Q.    Do you know what was done with these

18  timesheets after you prepared them?

19     A.    I do not know, no.

20     Q.    You weren't -- were you preparing these

21  timesheets to record the time you were working for

22  purposes of your payment, payment of money to you?

23     A.    No.

24     Q.    Why were you preparing them?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

223

1          A.      It was my understanding there was a

2    contract between the client and MediaBank that a

3    certain number of onsite support hours were

4    guaranteed as part of their contract.

5          Q.      Did you know what those hours were at

6    the time you prepared --

7          A.      I did not know.

8          Q.      -- these timesheets?

9                  (WHEREUPON, a certain document

10                 was marked Exhibit No. D-21, for

11                 identification, as of 2-25-10.)

12         THE WITNESS:  I'm ready.

13   BY MR. LEFKOFSKY:

14         Q.      Okay.  These timesheets reflect total

15   hours and billable hours.  Do you see that?

16         A.      Yes.

17         Q.      Now, the total hours in each of the

18   timesheets that you prepared -- some of these are

19   blank -- is more than the billable hours, right?

20         A.      Yes.

21         Q.      Why is it, if you weren't tracking the

22   time you were working with respect to payment to

23   you of any compensation, that you would be

24   tracking anything more than client billable hours?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

224

1      A.     I was instructed to by my supervisor.

2      Q.     And for some of these time entries, if

3   you just look at the first page of the exhibit,

4   you have MediaBank administrative, and you've got

5   two hours on four days and three hours on one day.

6   Do you see that?

7      A.     Yes.

8      Q.     What would that encompass?

9      A.     It could encompass a lot of things.  It

10  could encompass documentation, which was not

11  billable to the client.  It could involve me

12  loading information into the system in order to

13  prepare for a training, or entering information

14  into the system, rather.

15     Q.     Okay.  While you were working at

16  MediaBank -- do you currently smoke?

17     A.     Yes, I do.

18     Q.     And you smoked while you were employed

19  by MediaBank?

20     A.     Yes, I did.

21     Q.     On average, how many times a day would

22  you take a break to smoke?

23     A.     I don't know, probably three.

24     Q.     Sometimes more?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

225

1    A.    I don't remember.

2    Q.    Did you take a break during the day and

3    leave the offices for anything other than smoking?

4    A.    To grab food.

5    Q.    Okay.  Anything other than that?

6    A.    Not that I can remember, no.

7    Q.    And when you took a smoke break -- just

8    a smoke break right now -- how long would you

9    typically take that break for?

10    A.    It depends.  I don't remember.

11    Q.    Well, you had to leave the building,

12    walk outside, right?

13    A.    That's correct.

14    Q.    Were those typically more than ten

15    minutes each break?

16    A.    Not to my recollection, but I don't

17    remember.

18    Q.    And were you ever at work doing

19    anything non-work-related?

20    A.    I don't remember.

21    Q.    Do you remember doing any personal --

22    handling anything personal while you were at work?

23    A.    No, I don't remember.

24    Q.    Do you remember surfing any web sites



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

226

1    not work-related?

2         A.    I don't remember, no.

3         Q.    Do you remember conducting any Google

4    searches that were not work-related?

5         A.    No, I don't remember.

6         Q.    Do you think you did?

7         A.    It's possible.

8         Q.    Do you remember any instant message

9    chat conversations that you had with people?

10        A.    No.

11        Q.    You don't remember any?

12        A.    I had instant message conversations.    I

13   don't remember specifics.

14        Q.    But you had them at work, right?

15        A.    Yes, I did, sometimes.

16        Q.    Did they relate to work?

17        A.    Sometimes maybe, sometimes not.    I

18   don't know.    I don't remember.

19        Q.    In calculating your hours that you

20   claim you worked overtime, did you take into

21   consideration the time that you were at work but

22   not working and instead doing something personal?

23        A.    I believe I did, yes.

24        Q.    Why do you believe that?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

227

1        A.      Because I estimate how much time I

2    spent eating lunch or not doing work-related

3    activities.

4        Q.      How much time would you say on average

5    per day that is?

6        A.      I don't know.

7        Q.      Well, you said you took it into

8    consideration in calculating your overtime hours.

9    So if you took it into consideration, I'm assuming

10   that means you actually have an idea how long you

11   spent doing something other than work while you

12   were at work.

13            Or, if you don't have any idea, then

14   you couldn't possibly take it into consideration,

15   right?

16       MR. WASSERMAN:   Objection.

17       MR. LEFKOFSKY:   I just need an answer to that

18   question.

19       MR. WASSERMAN:   That was a compound

20   question/statement.   I'm not really sure what the

21   question is.   If you want to ask a question, ask

22   it.

23   BY MR. LEFKOFSKY:

24       Q.      Do you understand what I'm asking you?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

228

1    You said you took it into consideration, correct?

2        A.    Correct.

3        Q.    But now you're telling me you have no

4    idea on average per day how much time you were

5    spending doing non-work-related things at work.

6        A.    Just as I couldn't give you an exact

7    day-by-day breakdown of how many hours I worked at

8    MediaBank on a week-by-week example, I can't tell

9    you day to day.  That would have varied

10   tremendously depending on my schedule and what was

11   going on.

12       Q.    Any way you can tell me on average per

13   week how much time you spent doing

14   non-work-related things at work?

15       A.    I cannot tell you that, no.

16       Q.    So you can't tell me as you sit here

17   today how it is that you were able to calculate

18   the amount of overtime hours that you worked?

19       MR. WASSERMAN:  Objection.  That's not what

20   she testified to.

21       MR. LEFKOFSKY:  It is.

22       MR. WASSERMAN:  It mischaracterizes her

23   testimony.

24   BY MR. LEFKOFSKY:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

229

1      Q.     Can you tell me as you sit here today
2    how it is that you calculated your overtime hours
3    that you claim you worked?

4      A.     Based on the hours I was in the office.

5      Q.     You testified earlier you don't
6    remember when you came into the office, correct?

7      A.     It varied.

8      Q.     Okay.  And it varied when you left the
9    office, correct?

10     A.     Yes, it did.

11     Q.     And it varied how much time you spent
12   at work doing non-work-related things, correct?

13     A.     But it was a minimal amount.  Yes.

14     Q.     So how is it that you've calculated,
15   taking all this into consideration, and come up
16   with an overtime claim in some sense, 60 hours a
17   week, 50 hours a week, 45 or none?

18            How do you reach that conclusion now
19   when you're telling me you can't tell me with any
20   specificity the hours that you worked and the
21   hours that you performed non-work-related things?

22     A.     Because I know approximately what hours
23   I was working based on my memory of submitting
24   these timesheets to MediaBank.  And those only


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

230

1  included hours that I was in the office or at the

2  client site.

3         It did not include hours I was

4  preparing information at home for trainings or

5  preparing information at home for sales demos or

6  having conversations training other users from

7  other offices on the application.

8         Q.    Did anybody at MediaBank ever direct

9  you to work overtime?

10        A.    It seemed to be an understood

11 expectation that the job needed to be completed by

12 deadlines.

13        Q.    Okay.  Did anybody at MediaBank ever

14 direct you to work overtime on any given day?

15        A.    Not that I remember, no.

16     MR. LEFKOFSKY:  Matt, do you want to --

17     MR. WASSERMAN:  I definitely want to use the

18 restroom.  I'm trying to wait until you finish.

19     MR. LEFKOFSKY:  I'll do two more minutes, and

20 then I'll let you go.

21     MR. WASSERMAN:  Do what you've got to do.

22 BY MR. LEFKOFSKY:

23        Q.    How did you track the hours that you

24 worked at home?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

231

1       A.      By knowing what time I started and what

2   time I stopped.

3       Q.      So more than two years after, in some

4   cases, you working at home, you're telling me that

5   you remember specifically how much you worked at

6   home in 2007?

7       A.      I don't think that that's what I was

8   saying at all.  I was saying I can come to a

9   rational conclusion of how much time I spent at

10  home preparing information for a training session

11  or a sales demo or training other employees of

12  MediaBank.

13      Q.      Did anybody ever tell you to work at

14  home?

15      A.      I'm talking about after hours.

16      Q.      Did anybody ever tell you to work after

17  hours at home?

18      A.      No.

19      Q.      Did you set your own schedule?

20      A.      No, I did not.

21      Q.      What do you mean by that?

22      A.      There are set company hours.

23      Q.      What are the set company hours?

24      A.      I don't remember.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

232

1      Q.     Did you have to be at work at a certain

2   time?

3      A.     Not stated specifically, no.  Between

4   hours and hours.

5      Q.     Did you have to stay at work until a

6   certain time?

7      A.     I don't understand the question.

8      Q.     I'm asking:  Was there a requirement

9   that you stay at MediaBank's offices until a

10  certain time of day?

11     A.     Do you mean did somebody say, "You have

12  to stay until 6:00 p.m."?

13     Q.     Correct.

14     A.     No, nobody ever said, "You have to stay

15  until 6:00," or, "You have to stay until 7:00."

16     Q.     You just said that nobody told you when

17  you had to be there and nobody told you when you

18  had to stay until.

19            So my question was:  Did you set your

20  own schedule?

21     A.     No, I did not.

22     Q.     How can you say that when nobody at

23  MediaBank told you when to come and when to go?

24     A.     I don't know how you want me to answer



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

233

1    that question.

2        Q.   I can't understand how the answer is

3    accurate that you didn't set your schedule when

4    you testified that nobody told you when you had to

5    be there in the morning and nobody told you when

6    you had to leave at night.  I can't understand the

7    discrepancy in your answer.

8        A.   I don't understand where the

9    discrepancy is.

10       Q.   No one told you what time you had to

11   show up in the morning, correct?

12       A.   That's correct.

13       Q.   No one told you what time you had to

14   leave at the end of the day, correct?

15       A.   That's correct.

16       Q.   So then isn't it true that you could

17   come and go and set your schedule as you wanted as

18   long as you got your work done?

19       A.   I don't know.

20       MR. LEFKOFSKY:  Okay.  You go ahead, Matt.  I

21   know you want 15 minutes today.

22       MR. WASSERMAN:  I'd like it, yes.

23       MR. LEFKOFSKY:  No, no, by all means.  If you

24   need a break for two minutes --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

234

1          MR. WASSERMAN:  I physically don't think I

2     could do the 15 minutes right this second without

3     breaking.

4          MR. LEFKOFSKY:  We'll wait right here because

5     I've got to run.  Then I'll talk to you and we'll

6     figure out scheduling.

7          MR. WASSERMAN:  That's fine.  I just want to

8     take two minutes with Penny and use the restroom,

9     and then we can wrap up.

10               (WHEREUPON, a recess was had.)

11                    EXAMINATION

12     BY MS. BALSON:

13          Q.    Just to back up a little bit at a very

14     basic level, you -- not even necessarily related

15     to your job, but just as a person, you regularly

16     use the Internet, right?

17          A.    I do.

18          Q.    And you regularly use computers?

19          A.    I do.

20          Q.    As far as you can remember?  I mean,

21     when do you think you started using computers?

22          A.    High school.

23          Q.    Okay.  You've used e-mail for a while?

24          A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                FEBRUARY 25, 2010

                                   235

1        Q.    And none of those are things that you

2    were trained to do in any way, that's just from

3    life experience; is that right?

4        A.    That's correct.

5        Q.    Okay.  Now, have you ever -- we talked

6    a little about your education.  To get more

7    specific to like classes, ever taken any class at

8    all about computer science?

9        A.    No.

10       Q.    Anything about software writing or

11   coding?

12       A.    No.

13       Q.    Okay.  Anything about computer

14   hardware, like servers or, you know, that side of

15   computer stuff?

16       A.    No, nothing.

17       Q.    So you've never had any kind of

18   educational training on any of those things we

19   just talked about?

20       A.    That's correct.

21       Q.    Okay.  And before you had started your

22   job at MediaBank, you had never seen MediaBank's

23   software?

24       A.    That's correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

236

1        Q.    Okay.  So is it accurate to say that

2    everything you know about how MediaBank's software

3    works you learned while you were at the job?

4        A.    Yes.

5        Q.    Okay.  Now, I think you mentioned this

6    already, but just to clarify, was some of that

7    training at MediaBank that you received basically

8    you pretending to be a user?

9        A.    Yes.

10        Q.    Okay.  Now, when you say that you did

11    like user side, you know, say experimenting or

12    playing or whatever word, does that mean that you

13    were basically pretending to be a client?

14        A.    Yes.

15        Q.    So when we say "user," we mean clients?

16        A.    Yes.

17        Q.    Are the clients always or, I guess,

18    ever software developers?

19        A.    No, not to my knowledge anyway.

20        Q.    Okay.  So clients are more or less, at

21    least with respect to software, laypeople?

22        A.    Yes.

23        Q.    So you pretend that you are a client,

24    and that's how -- that's the mode in which you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

237

1  were playing with the software; is that right?

2       A.    Yes.   I was submitting the same

3  information they would as a user.

4       Q.    Where would you get this pretend

5  information?

6       A.    I would make it up.

7       Q.    What type of stuff would you make up?

8       A.    Total budget.

9       Q.    So like dollar figures?

10       A.    Dollar figures, campaign names.

11       Q.    And you would just make this stuff up

12  and you'd type it into fields; is that right?

13       A.    Yes, that is correct.

14       Q.    Then based on that you could run like

15  reports; is that right?

16       A.    Yes.

17       Q.    And that's the same exact thing that a

18  lay person at a client would be doing?

19       A.    That's correct.

20       Q.    All right.   So then one of the other

21  things that you testified about a couple of times

22  was when you were helping a user with some kind of

23  issue, whether it's an e-mail or phone call or

24  ticket or whatever, you would have to decide



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

238

1    whether you could fix it or whether you had to

2    pass it on to somebody else; is that right?

3           A.     That's right.

4           Q.     So what was the thing that would make

5    you decide whether it was something you could fix

6    or whether somebody else had to fix it?

7           A.     If I could reproduce the error and

8    solve the error without needing to create a ticket

9    that said it was a problem in the system, I could

10   communicate the user error to the user or retrain

11   them, and then the issue would be resolved.

12          If it required some kind of hardware or

13   software change, I would have to escalate the

14   ticket to other businesses within MediaBank, other

15   departments.

16          Q.     So just to make sure we understand the

17   terminology, when you say "user error," you mean a

18   mistake that's being made by the client?

19          A.     That's correct, a mistake in using the

20   application or in entering their information.  It

21   could be either side.

22          Q.     So if you as the account manager are

23   able to identify the client's mistake and that

24   that's the source of the problem, that answer when



Toll Free: 800.708.8087
Facsimile: 312.673.8138

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

239

1    you can fix it?

2         A.    That's correct.

3         Q.    Are there other instances that aren't

4    covered under that heading that you would be able

5    to fix?

6         A.    No, there are not.

7         Q.    Not at all throughout your entire time

8    at MediaBank?

9         A.    No.

10        Q.    So anything else that was not a mistake

11   by the client you had to give to somebody else to

12   handle?

13        A.    That's correct.

14        Q.    And then -- I think we went over this,

15   too.  But then, after somebody else at MediaBank

16   fixed it, then you would -- I think the phrase you

17   used before was test the solution or, you know,

18   play with the solution.

19             Were you doing anything other than what

20   we talked about before where you would pretend to

21   be the client?

22        A.    No, I wasn't.  I was pretending to be

23   the user trying to get the result I expected when

24   that person had contacted me and then just



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

240

1    relaying back to them whether it was resolved or

2    whether it was still being fixed by MediaBank.

3         Q.    So one of the documents you testified

4    to earlier is this Defendants' 10.  This is the

5    job description.

6              Before this litigation got started, had

7    you ever seen this document?

8         A.    I had not seen this document.

9         Q.    Okay.  Sorry.  We don't have this one.

10             The discussion that you had with

11   defendants' counsel earlier, was that looking at

12   these bullet points?

13        A.    Yes.

14        Q.    So that was under the responsibilities,

15   and each one is bulleted.  I just want to ask you

16   quickly about the ones -- you identified a few

17   that you thought were not accurate; is that right?

18        A.    That is correct.

19        Q.    Okay.  So I want to just ask you about

20   the ones that we didn't talk about.

21             This first one, I guess that's just a

22   background.  That's not actually a responsibility.

23   Okay.

24             So the second bullet point, would you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

241

1    read what that says.

2         A.    Do you want me to read it out loud?

3         Q.    Yes.

4         A.    "Respond to client inquiries, resolve

5    service issues and demonstrate proactive

6    solution-based approach to enhance client

7    relations."

8         Q.    That's something you said you thought

9    was accurate?

10        A.    I do.

11        Q.    Can you just put into your own words

12   what you think that means?

13        A.    It means when the client contacted

14   training and support regarding an issue that they

15   had with our system, I would do the things we just

16   talked about and either determine if it was a user

17   error and then follow up with the client directly

18   or, if it was a problem with the application, I

19   would send it to other teams within MediaBank.

20        Q.    Okay.    And the next one that had to do

21   with quality control, I see you've made a note

22   that that was one of the ones you said was not

23   accurate?

24        A.    That's correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

242

1      Q.    Okay.  Then this next one, can you just
2    read what the bullet point right there says.
3      A.    "Interpreting and resolving user
4    questions concerning system use."
5      Q.    Can you tell me in your own words what
6    you think that means.
7      A.    It means talking to the user to
8    determine if the issue is a training/user issue in
9    the software or if it's a bigger issue that's a
10   part of system, a system error.
11     Q.    And when you say "if it's a training
12   issue," is "training issue" the same as a mistake
13   by the client?
14     A.    Yeah, because it could either be they
15   don't know how to use the application or it could
16   be they mis-entered information into the system.
17     Q.    When you say "training issue," you mean
18   basically it may not be an oversight, it may be
19   they just don't understand and so they could be
20   trained?
21     A.    Yes.
22     Q.    And then they would understand?
23     A.    Correct.
24     Q.    Okay.  Going on to the next bullet



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

243

1    point, that one you have another marking.  So that

2    one you said was not accurate?

3            A.      Yeah.   Testing software applications, I

4    don't think that what I was doing would be

5    classified as testing.

6            Q.      But the next one, would you read that.

7            A.      "Writing software documentation, create

8    functional specs, create training materials and

9    agendas."

10           Q.      That's one you think is accurate?

11           A.      Yes.

12           Q.      Can you paraphrase in your own words

13   what that means to you?

14           A.      Basically providing a user manual,

15   creating the functional specs that we discussed

16   today.

17                   Then training materials could be a

18   condensed version of the documentation for that

19   particular training, and agendas were just, as I

20   discussed with opposing counsel, the outline of

21   what the training should involve.

22           Q.      Now, are any of those things listed or

23   that you just described things you could do

24   totally on your own?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

244

1        A.      None of them are things I could do

2   totally on my own.

3        Q.      Who else would need to be involved?

4        A.      QA, development, potentially other

5   account manager-type people at MediaBank, the

6   client.

7        Q.      Okay.  And why would you need those

8   other people?

9        A.      Because it takes all those moving parts

10  to complete the picture for the client and for

11  MediaBank.

12       Q.      What was your role with respect to

13  those moving parts?

14       A.      Well, I wrote documentation.  I -- I

15  didn't really create training materials, but --

16       Q.      Let me just stop.  I didn't mean to go

17  back to each one individually.

18           It seemed like you were saying the

19  common denominator of all those is you'd need

20  other people involved.

21       A.      Yes.

22       Q.      And I guess the question is:  What is

23  your role with respect to those other people?  It

24  sounds like there's several different people



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

245

1    involved.

2          A.    I'm the liaison, so I'm basically the

3    middle person working between mostly the client

4    and internal teams at MediaBank.

5          Q.    Okay.  Now, one of the things listed

6    that I want to have you elaborate on a little is

7    the functional spec.  That's also Defendants'

8    Exhibits 14 through 19; is that right?

9          A.    I think so.

10   MR. LEFKOFSKY:  I don't mean to jam you, but

11   I do have to go in about five minutes.  I don't

12   know if you can wrap up or if you want to finish

13   it next time.  Whatever you want to do.

14   MS. BALSON:  Five minutes is fine.

15   MR. LEFKOFSKY:  I'm not cutting you short.

16   BY MS. BALSON:

17         Q.    With respect to that functional spec

18   document, is that something you could create

19   without the client telling you what to put in it?

20         A.    No, it isn't.

21         Q.    Now, would that functional spec

22   document, even once it was in a final form, be the

23   thing that led directly to software changes?

24         A.    I don't believe so, but I don't know.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

246

1          Q.      What's your understanding of the next

2     step?

3          A.      I would imagine there is a technical

4     specification that the developers create.

5          Q.      A technical specification is different

6     than a functional specification?

7          A.      It is.

8          Q.      Just in laymen's terms, can you tell me

9     what is the difference between a functional spec

10    and a technical spec?

11         A.      I don't know, but I think the technical

12    spec would tell the software application how to

13    make the changes that the functional spec outlined

14    with information from the client.

15         Q.      Let's say the terminology, the

16    information, the details in the functional spec

17    all come from what the client tells you?

18         A.      That's correct.

19         Q.      And the client in maybe all of these

20    instances -- but tell me if that's not right --

21    doesn't know anything and isn't telling you

22    anything about how to code software?

23         A.      No, they are not.

24         Q.      And you are not adding that information



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

247

1    in?

2         A.    No, I am not.

3         Q.    So if there is a point at which that

4    information is added in, you think it might be

5    later in this technical spec, but you don't even

6    know for sure?

7         A.    That's correct.

8         Q.    Another thing that defense counsel

9    asked you quite a bit about throughout the

10   deposition was the importance of various things

11   that you did.

12              Did you ever participate in any

13   executive-level meetings like with a CEO or a COO

14   or a CFO, like a meeting that involved that whole

15   kind of grouping of anybody with "chief" in front

16   of their title?

17        A.    No.

18        Q.    You didn't.  Did you ever sit in on any

19   meetings about MediaBank's finances or the

20   management of the company?

21        A.    No, I did not.

22        Q.    You didn't.  Did anybody ever tell you

23   about the financial impact on MediaBank of the

24   different tasks you were doing?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

248

1      A.    No.

2      Q.    Nobody ever said to you, "If you mess

3   this up, this is a million-dollar error"?

4      A.    No.

5      Q.    Never in your time there?

6      A.    No.

7      Q.    All right.  Something else that you

8   were asked about was these -- there was some

9   discussion about the way certain things were

10  recorded.  We looked at some timesheets.  I think

11  you testified at one point that you thought maybe

12  your e-mails might reflect what time at night you

13  were doing work.

14          Are there types of work that you would

15  do that was necessary to get your job done at

16  MediaBank that couldn't be recorded by -- couldn't

17  be found by looking at your computer or e-mail or

18  your timesheets?

19     A.    Yes.  There were meetings that I held

20  with internal team members, especially in creation

21  of the functional specs.  Also, we had weekly

22  meetings internally with Cordie and them which I

23  was -- starting on this project.  We also had

24  weekly meetings for training and support.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

249

1          I could also be remoting to my desktop

2     computer because I wasn't able to access the

3     software on my laptop from wherever I was working.

4     There's many reasons.

5          Q.    Okay.  And those were all things that

6     you weren't asked to track by MediaBank?

7          A.    No, I was not.

8          Q.    And as far as you know, there wouldn't

9     be any way to compile information about how long

10    you were doing those on any day?

11         A.    No.

12         Q.    And then I guess the last question

13    really is, there was some brief mention of

14    instant message conversations.

15          Did you have a computer that was

16    assigned to you at MediaBank?

17         A.    Yes, I did.

18         Q.    Okay.  And did it come with instant

19    messaging on it or did you load that on?

20         A.    I don't remember.  I believe Skype was

21    on it.  I don't remember.

22         Q.    Okay.  Did MediaBank know that you had

23    had an instant message program on there?

24         A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

250

1      Q.     How do you know that they knew?

2      A.     Because they required us to add it at

3   one point in order to communicate with each other

4   around the different offices.

5      Q.     Do you remember who required you or who

6   told you that?

7      A.     Karen Kaplan told us to add Pigeon to

8   our computers.

9      Q.     And Pigeon is --

10     A.     Just a version of instant messaging.

11     Q.     So your supervisor Karen --

12     A.     Yes.

13     Q.     -- told you you had to install this

14  program for the purpose of talking to other

15  employees?

16     A.     That's correct, at different locations.

17     Q.     And would you -- I mean, did you then

18  end up using the instant message program for that

19  purpose occasionally?

20     A.     Of course.

21     Q.     And did you also occasionally have

22  personal conversations?

23     A.     Yes, I did.

24     Q.     Did you ever have a personal



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

251

1    conversation on a work telephone?

2        A.    I don't remember, but possibly.

3        Q.    Okay.

4    MS. BALSON:  I think that's about it.

5    MR. LEFKOFSKY:  One question and then I just

6    want to go on the record about the break.

7                   FURTHER EXAMINATION

8    BY MR. LEFKOFSKY:

9        Q.    I just want to make sure I heard

10   something correctly during the examination of your

11   counsel, which is:  Are you testifying that at no

12   point in time did you ever resolve on your own a

13   problem that came in from a customer that was not

14   solely based on a customer's error in entering

15   information?  Is that your testimony, that you

16   never handled or resolved a problem beyond that?

17       A.    No.  My testimony is that I could not

18   resolve any issue on my own that was beyond a user

19   error or a training issue.

20       Q.    Okay.  When you say "training issue,"

21   that's different than a user error, right?

22       A.    Yes.  It could be.

23       Q.    So you are saying -- when you say

24   "resolve on your own," are you saying that you had



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

252

1  to seek guidance from somebody else on any problem

2  outside of a customer input error or a training

3  error?  You couldn't solve anything?

4      A.    That's correct.

5      MR. LEFKOFSKY:  I'm all set.

6          Just for the record, what we've agreed

7  to is we're going to wrap up now.  I've got some

8  additional time if I want to do it.  I'll look

9  through everything, figure it out.  I'll notify

10  you guys.

11          If we do it, we're going to do it before

12  March 24.  There's a status conference.  We've all

13  agreed to do it within that time frame and to

14  extend discovery really for the sole purpose of

15  finishing up that one dep if we need to do it.  So

16  that's all I wanted to say.

17      MR. WASSERMAN:  I think that's all accurate.

18  For clarity, that is accurate to the extent that

19  it meets the seven-hour limit.

20      MR. LEFKOFSKY:  Yes, I agree.

21      MR. WASSERMAN:  We won't go beyond that.

22      MR. LEFKOFSKY:  Agreed.

23      MR. WASSERMAN:  We'll take it up as we go.

24      MR. LEFKOFSKY:  Perfect.  Okay.  We'll figure



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

253

1    that out.  I'm all set.  Thank you.

2         MR. WASSERMAN:  I think you should reserve

3    signature on hers.  I don't know what they want to

4    do.

5         MR. LEFKOFSKY:  Yeah.  We might as well.

6    That's fine.

7                   (WHEREUPON, the deposition was

8                   adjourned sine die.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                      FEBRUARY 25, 2010

                                254

1     STATE OF ILLINOIS )

2                       )  SS:

3     COUNTY OF COOK    )

4              I, INA RUTH EAVENSON, a Notary Public

5     within and for the County of Cook, State of

6     Illinois, and a Certified Shorthand Reporter of

7     said state, do hereby certify:

8              That previous to the commencement of

9     the examination of the witness herein, the witness

10    was duly sworn to testify the whole truth

11    concerning the matters herein;

12             That the foregoing deposition

13    transcript was reported stenographically by me,

14    was thereafter reduced to typewriting under my

15    personal direction and constitutes a true record

16    of the testimony given and the proceedings had;

17             That the said deposition was taken

18    before me at the time and place specified;

19             That I am not a relative or employee or

20    attorney or counsel, nor a relative or employee of

21    such attorney or counsel for any of the parties

22    hereto, nor interested directly or indirectly in

23    the outcome of this action.

24             IN WITNESS WHEREOF, I do hereunto set



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                        FEBRUARY 25, 2010

255

1   my hand at Chicago, Illinois, this 8th day of

2   March 2010.

3

4                    *Ina Ruth Eavenson.*

5

6

7                    Notary Public, Cook

8                    County, Illinois.

9                    My commission expires 3/24/2010.

10

11  C.S.R. Certificate No. 84-4293.

12

13

14                     OFFICIAL SEAL
                       INA RUTH EAVENSON
15            NOTARY PUBLIC - STATE OF ILLINOIS
           MY COMMISSION EXPIRES:03/24/10
16

17

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

256

1                       I N D E X

2    WITNESS                                EXAMINATION

3    PENNY VERKUILEN

4          By Mr. Lefkofsky                3, 251

5          By Ms. Balson                    234

6                     E X H I B I T S

7    NUMBER                                      PAGE

8    DEFENSE EXHIBIT

9    No. D-1                                     64

10   No. D-2                                     68

11   No. D-3                                     69

12   No. D-4                                     72

13   No. D-5                                     73

14   No. D-6                                     80

15   No. D-7                                     81

16   No. D-8                                     83

17   No. D-9                                    120

18   No. D-10                                   187

19   No. D-11                                   193

20   No. D-12                                   199

21   No. D-13                                   201

22   Nos. D-14 through D-19                     203

23   No. D-20                                   218

24   No. D-21                                   223



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

257

DEPOSITION ERRATA SHEET

Esquire Assignment No. 119517

Case Caption:  Verkuilen vs. MediaBank and

John Bauschard

DECLARATION UNDER PENALTY OF PERJURY

        I declare under penalty of perjury that
I have read the entire transcript of my Deposition
taken in the captioned matter or the same has been
read to me, and the same is true and accurate,
except for changes and/or corrections, if any, as
indicated by me of the DEPOSITION ERRATA SHEET
hereof, with the understanding that I offer these
changes as if still under oath.


        Signed on the _____ day of
_____, 20____.


_____
PENNY VERKUILEN


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

258

1        DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to _____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to _____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to _____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to _____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to _____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to _____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to _____

21   _____

22   Reason for change:_____

23   SIGNATURE: _____DATE:_____

24              PENNY VERKUILEN



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

PENNY VERKUILEN                                    FEBRUARY 25, 2010

259

1    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to _____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to _____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to _____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to _____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to _____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to _____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to _____

21   _____

22   Reason for change:_____

23   SIGNATURE: _____DATE:_____

24                    PENNY VERKUILEN



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com