**MEDIABANK**  **Weekly Timesheet**

Name: **Penny VerKuilen**

| | Sunday Start Date | 2/24/2008 |

Title: _____

| Client | Task | Sun 2/24/2008 | Mon 2/25/2008 | Tue 2/26/2008 | Wed 2/27/2008 | Thur 2/28/2008 | Fri 2/29/2008 | Sat 3/1/2008 | |
|--------|------|------|------|------|------|------|------|------|------|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | **Total Hours** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **Client Billable Hours** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Client Signature: _____ Date: _____

Employee Signature: _____ Date: _____

Manager Signature: _____ Date: _____

Finance Signature: _____ Date: _____

D-000241

**MEDIABANK**  **Weekly Timesheet**

Name: **Penny VerKuilen**

| | Sunday Start Date | 0/00/00 |
|---|---|---|

Title: _____

| Client | Task | Sun 0/00/00 | Mon #VALUE! | Tue #VALUE! | Wed #VALUE! | Thur #VALUE! | Fri #VALUE! | Sat #VALUE! | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | Total Hours | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Client Billable Hours | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Client Signature: _____  Date: _____

Employee Signature: _____  Date: _____

Manager Signature: _____  Date: _____

Finance Signature: _____  Date: _____

D-000242

 **Monthly Timesheet**

**Name:** Penny VerKuilen

**Title:**

| Week Beginning Date | Client Billable Hours Total |
|---|---|
| 2/3/2008 | 39.00 |
| 2/10/2008 | 34.00 |
| 2/17/2008 | 34.00 |
| 2/24/2008 | 0.00 |
| | |

Total          107.00

D-000243



## Non Competition

I will not, during the Non-Compete Period, without the prior written consent of MediaBank, directly or indirectly (i) induce or attempt to induce any customer, supplier, licensee, or business relation of MediaBank to cease doing business with MediaBank, or in any way interfere with the relationship between any customer, supplier, licensee, or business relation of MediaBank or (ii) solicit the business of any customer of MediaBank, whether or not I have or had personal contact with such entity for the purpose of engaging in a competing business purpose. The Non-Compete Period shall be the entire period of my relationship (either as an employee or independent contractor, whichever applies) with the MediaBank and inclusive of the period of twenty-four months after the termination of my relationship with the MediaBank, regardless of the reason for such termination of relationship.

During the Non-Compete Period, I will not, directly or indirectly, without the prior written consent of MediaBank, solicit, encourage, hire or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of MediaBank or any subsidiary of MediaBank to terminate his employment with MediaBank or any subsidiary of MediaBank.

I, **Penny Verkuilen**, hereby accept the terms of this agreement.

Signature: _____     Date: 7/23/2007

600 W Chicago Ave. Suite 830                                    Chicago, IL 60610

EXHIBIT
D3
2-25-10   RE

P0023



December 4, 2007

Penny Verkuilen
1935 N. Fairfield #112
Chicago, IL 60647

Dear Penny:

Your incentive stock options of 1,000 shares, as outlined in your offer letter, have been approved. The exercise price for each share of stock shall be equal to fair market value as of December 4, 2007. The stock will vest over a period of 4 years, with 25% vesting each year on this anniversary date. You must be employed with MediaBank in order for the options to vest. The options are subject to the terms and conditions of the MediaBank Options Policy.

You are a valued member of the team and we appreciate your continued effort and dedication to the company.

Sincerely,

John Bauschard
COO

cc: Vlad Karpel
    Linda Brzezinski

I, hereby accept this offer.

Signature: _____          Date: 12/10/2007

EXHIBIT
D4
2-25-10 RE

P0007





## EMPLOYEE INNOVATIONS AND SALES AGREEMENT

This Agreement is intended to formalize in writing certain understandings and procedures which have been in effect since the time I was initially employed by and/or doing work for MediaBank LLC, a Delaware Limited Liability Corporation ("Company"). In return for my new or continued employment and/or payment for services rendered by Company and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I acknowledge and agree that:

1.     Duties; At-Will Employment; No Conflict. I will perform for Company such duties as may be designated by Company from time to time. I agree that my employment and/or independent contractor relationship with Company is for no specified term, and may be terminated by Company at any time, with or without cause, and with or without notice. Similarly, I may terminate my employment with Company at any time, with or without cause, and with or without notice. During my period of employment by Company, I will devote my best efforts to the interests of Company and will not engage in other employment or in any activities determined by Company to be detrimental to the best interests of the Company without the prior written consent of Company.

2.     Prior Work. All previous work done by me for Company relating in any way to the conception, reduction to practice, creation, derivation, design, development, manufacture, sale or support of products or services for Company is the property of Company, and I hereby assign to Company all of my right, title and interest in and to such previous work.

3.     Proprietary Information. My employment and/or independent contractor status creates a relationship of confidence and trust between Company and me with respect to any information:

(a)     Applicable to the business of Company; or

(b)     Applicable to the business of any client or customer of Company, which may be made known to me by Company or by any client or customer of Company, or learned by me in such context during the period of my employment.

All such information has commercial value in the business in which Company is engaged and is hereinafter called "Proprietary Information." By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products and services of Company, and includes, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Company or to me in the course of Company's business.

4.     Ownership and Nondisclosure of Proprietary Information. All Proprietary Information is the sole property of Company, Company's assigns, and Company's customers, and Company, Company's assigns and Company's customers shall be the sole and exclusive owner of all patents, copyrights, mask works, trade secrets and other rights in the Proprietary Information. I hereby do and will

PA\890550.3

1



assign to Company all rights, title and interest I may have or acquire in the Proprietary Information. At all times, both during my employment by Company and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and I will not use or disclose any Proprietary Information or anything directly relating to Proprietary Information without the written consent of Company, except as may be necessary in the ordinary course of performing my duties as an employee of Company.

5.     <u>Ownership and Return of Materials.</u>   All materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists, and all other tangible media of expression) furnished to me by Company shall remain the property of Company. Upon termination of my employment and/or independent contractor status, or at any time on the request of Company before termination, I will promptly (but no later than five (5) days after the earlier of said termination or Company's request) destroy or deliver to Company, at Company's option, (a) all materials furnished to me by Company, (b) all tangible media of expression which are in my possession and which incorporate any Proprietary Information or otherwise relate to Company's business, and (c) written certification of my compliance with my obligations under this sentence.

6.     <u>Innovations.</u>   As used in this Agreement, the term "Innovations" means all processes, machines, manufactures, compositions of matter, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protectable under trade secret laws), and all other subject matter protectable under patent, copyright, moral right, mask work, trademark, trade secret or other laws, and includes without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, discoveries, artwork, software, and designs. "Innovations" includes "Inventions," which is defined to mean any inventions protected under patent laws.

7.     <u>Disclosure of Prior Innovations.</u>   I have identified on Exhibit A ("Prior Innovations") attached hereto all Innovations, applicable to the business of Company or relating in any way to Company's business or demonstrably anticipated research and development or business, which were conceived, reduced to practice, created, derived, developed, or made by me prior to my employment with Company (collectively, the "Prior Innovations"); and I represent that such list is complete. I represent that I have no rights in any such Innovations other than those Prior Innovations specified in Exhibit A ("Prior Innovations"). If there is no such list on Exhibit A ("Prior Innovations"), I represent that I have neither conceived, reduced to practice, created, derived, developed nor made any such Prior Innovations at the time of signing this Agreement.

8.     <u>Assignment of Innovations; License of Prior Innovations.</u>   I hereby agree promptly to disclose and describe to Company, and I hereby do and will assign to Company or Company's designee my entire right, title, and interest in and to, (a) each of the Innovations (including Inventions), and any associated intellectual property rights, which I may solely or jointly conceive, reduce to practice, create, derive, develop or make during the period of my employment with Company, which either (i) relate, at the time of conception, reduction to practice, creation, derivation, development, or making of such Innovation, to Company's business or actual or demonstrably anticipated research or development, or (ii) were developed on any amount of Company's time or with the use of any of Company's equipment, supplies, facilities or trade secret information, or (iii) resulted from any work I performed for Company, and (b) each of the Innovations which is not an Invention (as demonstrated by me by evidence meeting the clear and convincing standard of proof), and any associated intellectual property rights, which I may solely or jointly conceive, develop, reduce to practice, create, derive, develop, or make during the period of my employment with Company, which are applicable to the business of Company (collectively, the Innovations identified in clauses (a) and (b) are hereinafter the "Company Innovations"). To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by me to Company, I hereby grant to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to Company Innovations can be neither

P0012



assigned nor licensed by me to Company, I hereby irrevocably waive and agree never to assert such non-assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest to such non-assignable and non-licensable rights. I hereby grant to Company or Company's designees a royalty free, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice all applicable patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to any Prior Innovations which I incorporate, or permit to be incorporated, in any Company Innovations. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, any Prior Innovations in any Company Innovations without Company's prior written consent.

9.    Future Innovations.  I recognize that Innovations or Proprietary Information relating to my activities while working for Company and conceived, reduced to practice, created, derived, developed, or made by me, alone or with others, within three (3) months after termination of my employment and/or independent contractor relationship may have been conceived, reduced to practice, created, derived, developed, or made, as applicable, in significant part while employed by or working for Company. Accordingly, I agree that such Innovations and Proprietary Information shall be presumed to have been conceived, reduced to practice, created, derived, developed, or made, as applicable, during my employment with Company and are to be promptly assigned to Company unless and until I have established the contrary by written evidence satisfying the clear and convincing standard of proof.

10.    Cooperation in Perfecting Rights to Proprietary Information and Innovations.

(a)    I agree to perform, during and after my employment and/or independent contractor status, all acts deemed necessary or desirable by Company to permit and assist Company, at Company's expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Proprietary Information and Innovations assigned or licensed to, or whose rights are irrevocably waived and shall not be asserted against, Company under this Agreement.  Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Proprietary Information or Innovations.

(b)    In the event that Company is unable for any reason to secure my signature to any document required to file, prosecute, register, or memorialize the assignment of any patent, copyright, mask work or other applications or to enforce any patent, copyright, mask work, moral right, trade secret or other proprietary right under any Proprietary Information (including improvements thereof) or any Innovations (including derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, continuing patent applications, reissues, and reexaminations thereof), I hereby irrevocably designate and appoint Company and Company's duly authorized officers and agents as my agents and attorneys-in-fact to act for and on my behalf and instead of me, (i) to execute, file, prosecute, register and memorialize the assignment of any such application, (ii) to execute and file any documentation required for such enforcement, and (iii) to do all other lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of patents, copyrights, mask works, moral rights, trade secrets or other rights under the Proprietary Information, or Innovations, all with the same legal force and effect as if executed by me.

11.    No Violation of Rights of Third Parties.  My performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior to my employment with Company, and I will not disclose to Company, or induce Company to use, any confidential or proprietary information or material belonging to any previous employer or others.  I am not a party to any other agreement which will interfere with my full compliance with this Agreement.  I agree not to enter into any agreement, whether written or oral, in conflict with the provisions of this Agreement.

P0013



12. <u>Survival</u>. This Agreement (a) shall survive my employment and/or independent contract with Company; (b) does not in any way restrict my right or the right of Company to terminate my employment at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Company; and (d) is binding upon my heirs and legal representatives.

13. <u>Covenant Not to Compete or Solicit</u>.

(a) I will not during the Non-Compete Period, without the prior written consent of Company, directly or indirectly (i) induce or attempt to induce any customer, supplier, licensee, or business relation of Company to cease doing business with Company, or in any way interfere with the relationship between any customer, supplier, licensee, or business relation of Company or (ii) solicit the business of any customer of Company, whether or not I have or had personal contact with such entity for the purpose of engaging in a competing business purpose. The Non-Compete Period shall be the entire period of my relationship (either as an employee or independent contractor, whichever applies) with the Company and inclusive of the period of twenty-four months after the termination of my relationship with the Company, regardless of the reason for such termination of relationship.

(b) During the Non-Compete Period, I will not, directly or indirectly, without the prior written consent of Company, solicit, encourage, hire or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee or contractor of Company or any subsidiary of Company to terminate his employment or contracting engagement with Company or any subsidiary of Company.

(c) The Geographic Area shall mean (i) the United States or (ii) anywhere in the world outside the United States where Company or any subsidiary of Company conducts business

(d) <u>Separate Covenants</u>. I understand that the covenants contained in the preceding section shall be construed as a series of separate covenants, one for each county, city, state, or any similar subdivision in any Geographic Area. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in the preceding paragraphs. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of the preceding section are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable laws.

14. <u>Injunctive Relief</u>. A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there will be no adequate remedy at law, and Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

15. <u>Notices</u>. Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when delivered personally; (b) by overnight courier, upon written verification of receipt; (c) by telecopy or facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to me shall be sent to any address in Company's records or such other address as I may specify in writing. Notices to Company shall be sent to Company's Human Resources Department or to such other address as Company may specify in writing.

PA\890550.3

4



16.  **Governing Law.** This Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of Illinois, as such laws are applied to agreements entered into and to be performed entirely within Illinois between Illinois residents. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Illinois, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in Illinois, such personal jurisdiction shall be nonexclusive.

17.  **Severability.** If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same economic effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

18.  **Waiver; Amendment; Modification.** The waiver by Company of a term or provision of this Agreement, or of a breach of any provision of this Agreement by me, shall not be effective unless such waiver is in writing signed by Company. No waiver by Company of, or consent by Company to, a breach by me, will constitute a waiver of, consent to or excuse of any other or subsequent breach by me. This Agreement may be amended or modified only with the written consent of both me and Company. No oral waiver, amendment or modification shall be effective under any circumstances whatsoever.

19.  **Entire Agreement.** This Agreement represents my entire understanding with Company with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral.

I certify and acknowledge that I have carefully read all of the provisions of this Employee Innovations and Proprietary Rights Assignment Agreement and that I understand and will fully and faithfully comply with such provisions.

"COMPANY"                                      EMPLOYEE OR CONTRACTOR:

MediaBank LLC

By: _____                   By: _____

Title: _____                Printed Name: _____

Dated: _____                Dated: 7/23/2007



16.   Governing Law.  This Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of Illinois, as such laws are applied to agreements entered into and to be performed entirely within Illinois between Illinois residents.  Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Illinois, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in Illinois, such personal jurisdiction shall be nonexclusive.

17.   Severability.  If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same economic effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

18.   Waiver; Amendment; Modification.  The waiver by Company of a term or provision of this Agreement, or of a breach of any provision of this Agreement by me, shall not be effective unless such waiver is in writing signed by Company.  No waiver by Company of, or consent by Company to, a breach by me, will constitute a waiver of, consent to or excuse of any other or subsequent breach by me.  This Agreement may be amended or modified only with the written consent of both me and Company.  No oral waiver, amendment or modification shall be effective under any circumstances whatsoever.

19.   Entire Agreement.  This Agreement represents my entire understanding with Company with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral.

I certify and acknowledge that I have carefully read all of the provisions of this Employee Innovations and Proprietary Rights Assignment Agreement and that I understand and will fully and faithfully comply with such provisions.

"COMPANY"                                      EMPLOYEE OR CONTRACTOR:

MediaBank LLC

By: _____                    By: _____

Title: _____                 Printed Name: _Penny Verhuilen_

Dated: _____                 Dated: _7/23/2007_

P0016



## EXHIBIT A

PRIOR INNOVATIONS

## ACKNOWLEDGEMENT OF RECEIPT AND
## UNDERSTANDING OF EMPLOYEE HANDBOOK

I acknowledge having received a copy of the Media Bank, LLC Employee Handbook and I agree to read and become familiar with its contents. I understand that this Handbook is not an express or implied contract of employment nor does it create any rights in the nature of an employment contract.

Rather, this Handbook is an overview of the personnel policies that are related to my employment. Nothing shall restrict my right to terminate my employment at any time and nothing shall restrict the right of Media Bank, LLC to terminate my employment at any time.

I also understand that all the policies, rules, and regulations in the handbook may be changed from time to time at the Company's discretion with or without notice.

Print Name

Employee Signature                    Date Received    7/23/2007

EXHIBIT
D6
2-25-10 RE

## ACKNOWLEDGEMENT AND RECEIPT

### I have received my copy of the Employee Handbook.

The employee handbook describes important information about *MediaBank, Inc.*, and I understand that I should consult my supervisor or Human Resources regarding any questions not answered in the handbook. I have entered into my employment relationship with *MediaBank, LLC* voluntarily and acknowledge that there is no specified length of employment. **Accordingly, either I or *MediaBank, LLC* can terminate the relationship at will, with or without cause, at any time, so long as there is not violation of applicable federal or state law.**

I understand and acknowledge that my employment (absent a written contract to the contrary, signed by the CEO, President or other authorized officer) is terminable at the will of either *MediaBank, LLC* or me anytime for any reason or no reason.

This manual and the policies and procedures contained herein supersede any and all prior practices, oral or written representations, or statements regarding the terms and conditions of your employment with *MediaBank, LLC* By distributing this handbook, the Company expressly revokes any and all previous policies and procedures which are inconsistent with those contained herein.

I have read the E-Mail and Electronic Communication policy and agree to abide by its terms. I have read the broad Workplace Search policy and know that my privacy in the workplace is affected and limited by this policy.

I understand that, except for employment at-will status, any and all policies and practices may be changed at any time by *MediaBank, Inc.*, and the company reserves the right to change my hours, wages and working conditions at any time. I recognize *MediaBank, Inc.*'s right to make unilateral changes in the content, interpretation, or application of the handbook anytime *MediaBank, LLC* deems appropriate, even if the changes to be implemented have not been communicated, reprinted or substituted in the manual or elsewhere. I understand that revised information may supersede, modify, or eliminate existing policies. Only the President of *MediaBank, LLC* has the ability to adopt any revisions to the policies in this handbook.

**I understand and agree that nothing in the Employee Handbook creates, or is intended to create, a promise or representation of continued employment and that employment at *MediaBank, LLC* is employment at-will, which may be terminated at the will of either *MediaBank, LLC* or myself. Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document.** I understand and agree that employment and compensation may be terminated with or without cause and with or without notice at any time by *MediaBank, LLC* or myself.

I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

_____
Employee's Signature

_____
Employee's Name ( Print )

_____
Date

### TO BE PLACED IN EMPLOYEE'S PERSONNEL FILE

Revised July 2008

EXHIBIT
D 7
2-25-10   RE

2

P0002

## ACKNOWLEDGEMENT OF RECEIPT AND
## UNDERSTANDING OF EMPLOYEE HANDBOOK

I acknowledge having received a copy of the Media Bank, LLC Employee

Handbook and I agree to read and become familiar with its contents. I understand that this

Handbook is not an express or implied contract of employment nor does it create any rights in

the nature of an employment contract.

Rather, this Handbook is an overview of the personnel policies that are related to my

employment. Nothing shall restrict my right to terminate my employment at any time and

nothing shall restrict the right of Media Bank, LLC to terminate my employment at any

time.

I also understand that all the policies, rules, and regulations in the handbook may be

changed from time to time at the Company's discretion with or without notice.

_____
Print Name

_____        9/11/2007
Employee Signature                      Date Received

EXHIBIT
D8
2-25-10   RR

P0009

14

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PENNY VERKUILEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   09 C 3527 |
| | ) | |
| MEDIABANK, LLC, | ) | Judge Grady |
| and JOHN BAUSCHARD, individually, | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff, Penny Verkuilen ("Verkuilen"), by her attorneys, Golan & Christie LLP, pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby answers Defendants MediaBank, LLC ("MediaBank") and John Bauschard's ("Bauschard") (collectively the "Defendants") First Set of Interrogatories, as follows:

### GENERAL OBJECTIONS

1.      Verkuilen objects to these interrogatories to the extent they may be construed as seeking information: (i) prepared by or for any of Verkuilen's attorneys; (ii) prepared in anticipation of litigation; or (iii) constituting or reflecting the impressions, conclusions, opinions, or legal research of Verkuilen's counsel or confidential communications between Verkuilen and her attorneys. Such information is protected from discovery under the attorney-client privilege or the attorney work product doctrine or both.

2.      Verkuilen objects to any interrogatory to the extent it seeks information in the possession, custody or control of any persons other than Verkuilen.

3.      Verkuilen objects to these interrogatories to the extent that the terminology in



EXHIBIT
D9
2-25-10 RE

Defendants' interrogatories is intended to characterize the evidence to be presented in this litigation.

4.      Verkuilen expressly reserves the right to supplement and amend her Answers to these Interrogatories.

Without waiving any of the foregoing General Objections, Verkuilen responds to each of Defendants' interrogatories as follows, incorporating by reference each of the foregoing General Objections in each of the specific responses below:

**ANSWERS**

1.      Identify and describe your primary duties while employed by MediaBank.  For each duty identified, state:

      a.      the approximate amount of time, on an average workweek-by-workweek basis, that you spent completing the duty;

      b.      any basis, evidence or support for the calculations in your answer to part (a) above; and

      c.      whether you were required to report to a supervisor during or following the completion of each duty.

**ANSWER:**

From July 23, 2007 to approximately October 1, 2007, Verkuilen was working as an Account Manager on what was known as the "A|X system".  Prior to joining MediaBank, Verkuilen had no knowledge of, and had to be trained how to use, the A|X system. As an Account Manager, Verkuilen worked with MediaBank's clients and internal teams to create and generate reports for the client to monitor the performance of the client's media buying campaigns.  Verkuilen uploaded files and also sent files for upload to the database team.  Once the data was loaded, Verkuilen compiled the reports for MediaBank's clients and checked the data for accuracy.  All hours worked during this period were for this product.  Verkuilen does not

2

recall the exact amount of time spent working on each task, but was working at least 40 hours per week. Verkuilen was assigned each task and reported to Jay Lawrence at the end of each task. Verkuilen copied Mr. Lawrence on reports sent to clients, the database team and other related individuals and entities.

On or about October 1, 2007, Verkuilen was advised that she would be transferred from the "A|X system" to begin working on what was known as the "O|X system." At the time she was transferred, Verkuilen had no prior knowledge of the O|X system. Beginning on or about October 1, 2007, Verkuilen was trained to use the O|X system by MediaBank's employees, Bob Saldeen and Melissa Le. Those individuals walked Verkuilen through the original version of the program and taught Verkuilen how to input information. At its inception, MediaBank's intent was to use JavaScript to operate the O|X system, however during Verkuilen's training, JavaScript had not yet been implemented and Bob Saldeen and Melissa Le used a FileMaker Pro version of the system to train Verkuilen.

Once Verkuilen's training was complete, Melissa Le provided Verkuilen with a draft user manual and asked Verkuilen to follow the format, operate the system and suggest modifications from user perspective. Melissa Le reviewed and made the final decision regarding the contents of the user manual. Verkuilen also attended and participated in several User Acceptance Tests, which were created by MediaBank to determine whether the O|X system functioned in accordance with MediaBank's clients' requirements. During these User Acceptance Tests, Verkuilen and other MediaBank employees would assist MediaBank's clients in using the O|X system to ensure its functionality. Verkuilen did not test the system to determine what hardware, software or system functional specifications were required because she did not possess the requisite knowledge or skill necessary to do so. Verkuilen also assisted MediaBank's clients

3

with on-site training and functionality sessions to determine whether the system met the customers' requirements. Verkuilen was assigned each project by, and reported to Melissa Le or Anne Marie Checcone at the end of each project. During the period of October 1, 2007 to December 31, 2007, Verkuilen worked approximately 60 hours per week on these tasks.

During the period of January 1, 2008 to approximately October 1, 2008, Verkuilen provided on-site support to certain MediaBank clients located in Chicago, Atlanta and Los Angeles. Verkuilen's on-site support included answering help line telephone calls and entering JIRA tickets for user, training and software issues identified by MediaBank's clients. JIRA is the ticketing system used by MediaBank for tracking problems with the software that were reported by MediaBank's clients. Verkuilen also provided assistance to MediaBank's new employees and sales people in learning the systems. Verkuilen was assigned each project by and reported to, Melissa Le, Anne Marie Checcone, Allison Bhatia or Karen Kaplan at the end of each project. During this time, Verkuilen worked an average of approximately 50 hours per week.

During the period of approximately October 1, 2008 to December 31, 2008, Verkuilen was working in MediaBank's office located in Chicago. Verkuilen conducted many of the same tasks listed herein. Verkuilen was assigned each project by, and reported to Karen Kaplan or Drew Kane at the end of each project. During this time, Verkuilen worked an average of approximately 45 hours per week.

During the period of January 1, 2009 through her termination, Verkuilen split her time working on the A|X system and the O|X system. Verkuilen conducted many of the same tasks listed above. During this time, Verkuilen acted as a liaison or middleman between MediaBank's programming and development teams, on the one hand, and MediaBank's clients, on the other

hand. In that capacity, Verkuilen created work tickets using the JIRA ticketing system to document MediaBank's customers' requests or other concerns regarding the application. Verkuilen conveyed the information to MediaBank's developers so that the developers could add any required functionality to the application. During this time, Verkuilen worked an average of at least 40 hours per week.

Throughout the entire time she was employed by MediaBank, Verkuilen never exercised any discretion or independent judgment about how the A|X system and the O|X system would function nor did she exercise any discretion or independent judgment about what technical features needed to be added to the systems in order for the systems to meet MediaBank's customers' requirements. Verkuilen did not write computer or software code and did not make any changes to the application. Verkuilen was not required to have any specialized knowledge in computer systems analysis, programming or software engineering to perform any tasks for MediaBank. Verkuilen followed the explicit instructions of her superiors at MediaBank and was not permitted to deviate from those instructions without prior approval. Verkuilen never advised MediaBank or its management regarding planning, negotiating, representing the company, purchasing, promoting sales or business research and control. Verkuilen did not assist MediaBank in the formulation or execution of company policies.

2. State in detail why you contend that your job duties were not related to MediaBank's management, general business operations, running or servicing MediaBank's business.

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 1. Answering further, Verkuilen was directed and supervised on all tasks and projects by MediaBank's management team, including Karen Kaplan, Melissa Le, Anne Marie Checcone, Allison Bhatia, Cordie DePascal, Drew Kane,

5

Elizabeth Williamson, Jay Lawrence and Aparna Khare. Verkuilen did not exercise any independent judgment or discretion, but rather followed explicit instructions for each task from MediaBank's management team.

3.     State in detail the basis for your claim that you did not ever exercise discretion or independent judgment in the performance of your duties at MediaBank.

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 1. Answering further, Verkuilen did not make any decisions while working for MediaBank without the express approval of her superiors, including the management team. Verkuilen did not make any decisions regarding the functionality of the software. Verkuilen did not write computer or software code, did not add functionality and did not otherwise modify MediaBank's software to meet its clients' needs. Verkuilen also did not have any discretion or independent judgment regarding the amount of time spent or the amount of money billed to MediaBank's clients.

4.     Describe the nature and frequency of, on an average workweek-by-workweek basis, your interaction with MediaBank's customers.

**ANSWER:**

Verkuilen interacted with MediaBank's clients on a daily basis.

5.     Identify and describe your duties with respect to MediaBank's customers. For each duty identified, state the amount of time, on an average workweek-by-workweek basis, you spent to complete each duty.

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 1.

6.     Identify each and every customer, and each representative of that customer, that you had contact with during your employment at MediaBank.

**ANSWER:**

Verkuilen objects to this interrogatory on the basis that the information sought is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Verkuilen further objects to this interrogatory because it is overbroad. Without waiving said objections, Verkuilen states that she had contact with the following MediaBank customers while she was employed by MediaBank:

> MediaVest
> StarCom
> Moxie Interactive
> GM Planworks
> Fallon
> Time Warner

7. Did you receive from MediaBank at any time during your employment the MediaBank Employee Handbook? If yes, please state when you received it (if you don't know the exact date, provide the approximate date).

**ANSWER:**

Yes, on July 23, 2008.

8. If your answer to Interrogatory #7 is yes, did you read the Employee Handbook? If your answer is no, please state why.

**ANSWER:**

Yes.

9. If your answer to Interrogatory #8 is yes, did you understand everything that you read? If your answer is no, please identify specifically which provisions of the Employee Handbook you did not understand and what steps you took to insure that you did obtain a better understanding of these provisions.

**ANSWER:**

Yes.

10. Did you receive from MediaBank at any time during your employment the MediaBank Employee Manual? If yes, please state when you received it (if you don't know the exact date, provide the approximate date).

7

**ANSWER:**

Verkuilen does not recall if she received the MediaBank Employee Manual.

11.   If your answer to Interrogatory #10 is yes, did you read the Employee Manual? If your answer is no, please state why.

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 10.

12.   If your answer to Interrogatory #11 is yes, did you understand everything that you read? If your answer is no, please identify specifically which provisions of the Employee Manual you did not understand and what steps you took to insure that you did obtain a better understanding of these provisions.

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 10.

13.   Identify whether, and specifically how, you kept track of the hours you worked at MediaBank during the entire time that you were employed by MediaBank. In your answer to this Interrogatory, if the methods that you used to keep track of your hours changed at any time during your employment at MediaBank, indicate when, why and how these methods changed.

**ANSWER:**

From July 23, 2007 to approximately January 1, 2008, Verkuilen was not required by MediaBank, and therefore did not, keep track of the hours she spent working at MediaBank. On January 1, 2008, when she began working on-site at MediaBank's clients' offices, pursuant to the explicit instructions of her superiors, Verkuilen began tracking billable hours in an excel spreadsheet that was distributed by MediaBank's training manager. Verkuilen was required to and did submit a spreadsheet on a weekly basis to Anne Marie Checcone, Allison Bhatia, and Karen Kaplan, respectively. Verkuilen was only required, and therefore only tracked, those hours worked on-site at a MediaBank client. Verkuilen followed the explicit instructions of MediaBank's management team regarding the manner in which her time was to be tracked.

In or about October of 2008, Verkuilen returned to working at MediaBank's office located in Chicago. Verkuilen followed the explicit instructions of her supervisors regarding tracking her hours. Verkuilen did not and could not exercise any discretion regarding which hours were, or were not, billable to MediaBank's clients. Verkuilen submitted her billing statements to the training manager either weekly or monthly, Verkuilen cannot recall which.

14. Identify with specificity what records, if any, that you have that support your claim that you worked an average of 8 hours of overtime a week during your employment at MediaBank.

**ANSWER:**

Verkuilen has produced several email correspondence in support of her claims. Verkuilen submits that the vast majority of the documents which support her claims are in MediaBank's possession, subject to production pursuant to Verkuilen's First Request for Production of Documents served upon MediaBank in this case.

15. At any point in time during your employment at MediaBank, did you ever ask for, or obtain, pre-authorization to work overtime? If your answer is yes, state every instance where you either asked for, or obtained pre-authorization to work overtime, including when this occurred and who authorized the overtime, and whether the authorization was in writing or verbal.

**ANSWER:**

From the outset of her employment, Verkuilen was told by MediaBank that she was an exempt employee and therefore not required to request or obtain pre-authorization to work overtime.

16. During an average work-day while you were employed at MediaBank, and while you were working on-site at MediaBank's offices, please state:

   a. On average, how many work breaks you took and the average length of each work break;

   b. The average length of your lunch break; and

      c.      The amount of time you spent doing non-work related activities (for example, talking to friends, instant messaging, searching non-work related websites, etc.).

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 1. On most days, Verkuilen did not take a lunch break other than a few minutes to purchase food and immediately return to her desk or other work station. On average, Verkuilen estimates that she took two fifteen minute breaks per day. Verkuilen estimates that she spent less than one hour per week doing non-work related activities during business hours.

17.    During an average work-day while you were employed at MediaBank, and while you were working at a customer's offices or facility, please state:

      a.      On average, how many work breaks you took and the average length of each work break;

      b.      The average length of your lunch break; and

      c.      The amount of time you spent doing non-work related activities (for example, talking to friends, instant messaging, searching non-work related websites, etc.).

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 16.

18.    During your employment at MediaBank, did you ever inform anyone that you were working more than 40 hours per week? If your answer is yes, please state the following:

      a.      the name of each person you notified;

      b.      the date you notified each person; and

      c.      for each person notified state whether the notification was in writing or verbal.

**ANSWER:**

Verkuilen objects to Interrogatory No. 18 on the grounds that it is overbroad. Without waiving said objection, Verkuilen often worked overtime with, and therefore informed the following individuals both orally and in writing, that she was working more than 40 hours per week: Allison McHone, Elizabeth Williamson, Gina Grandinetti, Dan Puccini, Drew Muskin, Danielle Casey, Arianne McHugh, Caren Cooper and Nanci Meyler.

19.    With respect to all non-work related websites that you accessed during any work day while you were employed at MediaBank, identify the specific website, why you accessed it, how long – on average – you spent on this website, and whether you informed anyone at MediaBank that you were accessing these websites during normal business hours. If you did inform anyone at MediaBank, identify the person you informed, and when you informed this person.

**ANSWER:**

See Verkuilen's Answer to Interrogatory No. 16. Further answering, Verkuilen estimates that she accessed the following websites, for no more than 10 minutes at a time on a very limited basis, during regular business hours: google.com, yahoo.com and facebook.com.

Respectfully submitted,

PENNY VERKUILEN,

By:

One of Her Attorneys

Margaret A. Gisch, Esq. (#6204431)
Matthew C. Wasserman, Esq. (#6287638)
Laura A. Balson, Esq. (#6291377)
GOLAN & CHRISTIE LLP
70 West Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300

11

## CERTIFICATE OF SERVICE

I, Matthew C. Wasserman, an attorney, hereby certify that I caused a copy of the foregoing *Plaintiff's Answers to Defendants' First Set of Interrogatories* to be served upon the following by electronic mail and regular U.S. Mail, postage prepaid, on the 7th day of January, 2010, addressed as follows:

> Steven R. Lefkofsky
> Lefkofsky & Gorosh, P.C.
> 31500 Northwestern Highway, Suite 105
> Farmington Hills, Michigan 48334
>
> Kathryn Zeledon Nelson
> Jaffe & Berlin, LLC
> 111 W. Washington Street, Suite 1401
> Chicago, IL 60602