

CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3009

PENNY VERKUILEN,

           *Plaintiff-Appellant*,

*v.*

MEDIABANK, LLC, *et al.*,

           *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 3527—**John F. Grady**, *Judge*.

ARGUED JANUARY 11, 2011—DECIDED MAY 27, 2011

Before EASTERBROOK, *Chief Judge*, and CUDAHY and POSNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, establishes a federal minimum wage and also—critical to this case—requires employers to pay their employees 150 percent of their hourly wage for hours worked above 40 a week. § 207(a)(1). But the Act denies this entitlement to "any employee employed in a bona fide executive, *administrative*, or professional capacity." § 213(a)(1) (emphasis added).

Case: 1:09-cv-03527 Document #: 81 Filed: 06/20/11 Page 2 of 7 PageID #:1943
Case: 10-3009   Document: 00711556358   Filed: 06/20/2011   Pages: 7

2                                                         No. 10-3009

The plaintiff was an account manager for a company (the defendant, MediaBank) that provides computer software to advertising agencies; she acted as a bridge between the software developers and the customers, helping to determine the customers' needs, then relaying those needs to the developers and so assisting in the customization of the software, and finally helping the customers use the customized software. The district court rejected her overtime claim on summary judgment.

The claim relies heavily on the Department of Labor's regulation—29 C.F.R. Part 541—that seeks to explain "administrative capacity." The term is not self-defining. The regulation provides that to be deemed to be employed in an administrative capacity the employee must be paid more than $455 a week, § 541.200(a)(1) (a requirement our plaintiff is conceded to satisfy) and his "primary duty" must be both "the exercise of discretion and independent judgment with respect to matters of significance," § 541.200(a)(3), and "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." § 541.200(a)(2). The regulation instances, as employees whose work may be directly related to a customer's business, ones "acting as advisers or consultants to their employer's clients or customers." § 541.201(c); see, e.g., *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865, 871-72 (7th Cir. 2008).

The regulation's "primary duty" provisions, which we just quoted, are pretty vague, as is the further provision that "to meet [the] requirement [that the employee's

No. 10-3009 3

primary duty be directly related to management or general business operations], an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." § 541.201(a). Notice the gap: employees who don't perform work directly related to assisting with the running or servicing of the employer's or its customers' business are not necessarily employees who "for example" work on an assembly line or work in a retail store as a salesperson.

Yet one sees what the regulation is getting at: a legal requirement to pay a worker a fixed percentage increase in his hourly wage if he works more than 40 hours a week doesn't fit a worker who spends much of his work time off the employer's premises, where he can't be supervised and so if entitled to overtime would be tempted to inflate his hours. See 29 C.F.R. § 541.202(c); *Piscione v. Ernst & Young,* 171 F.3d 527, 541, 545-46 (7th Cir. 1999); *Robinson-Smith v. Johnson & Johnson*, 593 F.3d 280, 282-83, 285 (3d Cir. 2010); *Smith v. Government Employees Ins. Co.*, 590 F.3d 886, 894-95 (D.C. Cir. 2010); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 338-39 (4th Cir. 2008); *Staunch v. Continental Airlines, Inc.*, 511 F.3d 625, 630-31 (6th Cir. 2008); *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 742-43 (6th Cir. 2000). This is particularly true if, as the regulation also requires, the work involves the exercise of independent judgment relating to management or general business operations, see, e.g., *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 375

(7th Cir. 2005), especially the business operations of a customer. An employer will be hard pressed to determine how many hours an employee should need to complete a particular job much of which is performed on the premises of a different company. Employees tasked with jobs requiring the exercise of independent judgment usually are expected to work with a minimum of supervision even when they are working in their office rather than on a customer's premises. See *Roe-Midgett v. CC Services, Inc.*, *supra*, 512 F.3d at 868.

It might seem that in any event a requirement of additional compensation for overtime couldn't sensibly be applied to workers, such as the plaintiff in this case, whose hours of work vary from week to week, regardless of the nature of their work or where it is performed—a worker who worked 20 hours in one week and 60 in the next would have to be paid more than one who worked 40 hours both weeks. But the statute and regulation offer solutions for the "fluctuating hours" problem. See 29 U.S.C. § 207(f); 29 C.F.R. §§ 778.114, .404, .405; *Walling v. A.H. Belo Corp.*, 316 U.S. 624, 627, 630-35 (1942); *Condo v. Sysco Corp.*, 1 F.3d 599, 601-03 (7th Cir. 1993). So it does not figure in our analysis.

Still it is apparent that our plaintiff is a picture-perfect example of a worker for whom the Act's overtime provision is *not* intended. MediaBank, the employer, is in what is called the "media buying" business. See "Media Buying," *Wikipedia*, en.wikipedia.org/wiki/Media_buying; MediaBank, "O|X Suite," www.mbxg.com/ox-suite.php; MediaBank, "C|D Suite

No. 10-3009 5

(formerly A|X)," www.mbxg.com/products.php?p=axsuite; Joe Mandese, "MediaBank Launches 'DSP' for Analog Media: Ushers in 'Audience-Buying' for Print, Out-of-Home, Etc.," *Media Daily News*, Aug. 20, 2010, www.mediapost.com/publications/?fa=Articles.showArticle&art_aid=134152 (all visited May 4, 2011). It produces software programs that help advertising agencies place advertising in the media. The software is complex; "advertising today deals with an endless number of touchpoints that interconnect in ways we couldn't imagine as recently as five years ago. Those changes create enormous challenges in terms of managing data and workflow: if I'm a media buyer, I suddenly need to sync mobile buys with outdoor ads, and search inventory with TV spots. If I'm a vendor, I'm working under ever-greater pressure to generate greater revenue from ads—while buyers are pulled in endless directions toward multiple channels, and potentially away from my inventory." "New CEO Bill Wise Says MediaBank Aims to Give Media Ecosystem Control Over Media Buying, Data Management," July 14, 2010, www.adexchanger.com/ad-exchange-news/mediabank (visited May 4, 2011).

Searching the Web for media outlets for advertisers, negotiating with media companies, and evaluating the effectiveness of media advertising purchases in promoting a seller's products or services—all these tasks are integrated in the software that MediaBank sells advertising agencies to give agency staff access to the full range of the agency's activities on its computer screens. The software is complex because it integrates so many functions, and it must be customized to the needs of

each client, which vary. The complexity and variance are where the account manager comes in. The manager of a customer's account has to learn about the customer's business and help MediaBank's software engineers determine how its software can be adapted to the customer's needs.

The account manager is not a salesman for Best Buy or a technician sitting at a phone bank fielding random calls from her employer's customers—instead she's on the customer's speed dial during the testing and operation of the customer's MediaBank software. As the intermediary between employees of advertising agencies struggling to master complex software and the software developers at MediaBank, she has to spend much of her time on customers' premises training staff in the use of the software, answering questions when she can and when she can't taking them back to MediaBank's software developers, and then explaining their answers to the customer and showing the customer how to implement the answers in its MediaBank software. Identifying customers' needs, translating them into specifications to be implemented by the developers, assisting the customers in implementing the solutions—in the words of MediaBank's chief operating officer, account managers are expected to "go out, understand [the customers' requirements], build specifications, understand the competency level of our customers. Then they will build functional and technical specifications and turn it over to . . . developers who will then build the software, . . . checking in with the account manager, making

sure what they are building is ultimately what the customer wanted."

Thus the plaintiff's primary duty was directly related to the general business operations both of her employer and (as in a consulting role) of the employer's customers. It is true that the regulation, only a few provisions of which we have quoted (it goes on and on), lists a number of "administrative" functions that the plaintiff did *not* perform, such as negotiating contracts with MediaBank's customers. But below the highest executive level a modern business is a congeries of specialists. The plaintiff could not have performed her job as the intermediary between developers and customers had she also been negotiating contracts.

AFFIRMED.